THOMAS F. ROGERS v. MINNEAPOLIS & ST. LOUIS RAILWAY
COMPANY.[1]

July 20, 1906.

Nos. 14,830—(150).

**Death by Wrongful Act—Evidence.**

In a personal injury action, the evidence *held* to sustain the verdict.

Action in the district court for Freeborn county by plaintiff as administrator of the estate of Edward McGillan, deceased, to recover $5,000 for the death of decedent. The action was tried before Kingsley, J., and a jury, which rendered a verdict in favor of plaintiff for $4,000. From an order denying a motion for judgment notwithstanding the verdict or for a new trial, defendant appealed. Affirmed.

*John I. Dille, W. S. Hammond,* and *George W. Seevers,* for appellant.

*Morgan & Meighen* and *Lovely & Dunn,* for respondent.

ELLIOTT, J.

This is an action by an administrator to recover damages for the death of Edward McGillan, a switchman in the defendant's yards at Albert Lea. McGillan was killed February 13, 1904, while engaged in separating an engine from a mail car. The plaintiff claims that death was caused by the act of an employee of the defendant in negligently backing an engine upon the deceased. There was a verdict for the plaintiff, and the defendant appealed from an order denying its motion for judgment notwithstanding the verdict, or for a new trial.

The only question presented by the record is whether the evidence was sufficient to sustain the verdict. The appellant contends that there was no evidence from which the jury was justified in drawing the inference that McGillan's death was caused by the negligent backing of the engine upon him while he was engaged in his work. The respondent argues that this is the reasonable and proper inference to be drawn from the facts and circumstances in evidence. Unfortunate-

[1] Reported in 108 N. W. 868.

ly, John Engblom, the man who was in charge of the engine, was not called as a witness, although he was in the courtroom at the time of the trial. The jury was thus deprived of the benefit of the evidence of the only eyewitness, and the only living person who knew how the accident happened. It is not necessary for plaintiff to show by eye-witnesses exactly how the accident occurred in order to recover. It is not necessary in any action, civil or criminal, that the material facts should be established by direct evidence. In civil cases, it is sufficient if the evidence on the whole supports the hypothesis which it is adduced to prove, and it is the duty of the jury to decide according to the reasonable probability of the truth. The burden was upon the plaintiff to show the alleged negligence, and establish a causal connection between the alleged negligence and the injury. Proof of causal connection may be direct or circumstantial, but the evidence must be something more than consistent with the plaintiff's theory of how the accident occurred.

We have read the record carefully, and have come to the conclusion that the jury was justified in drawing the conclusion from the evidence that the deceased came to his death by reason of the negligence of the defendant, as alleged, and that the acts of negligence which caused his injury are fairly, and reasonably inferable from the facts and circumstances actually disclosed by the evidence.

It appears that east of the Union Station in Albert Lea, in the defendant's yards, there is a main track running north and south. About one hundred fifty feet from the station there is a freighthouse and west of the station and freighthouse are a number of tracks running north and south. Track No. 1 is immediately west of the freighthouse and Union Station. Track No. 7 connects the south switches with the engine house. These and other tracks extend north and south in the yards about thirteen hundred feet connecting at both ends with the main track of defendant's line. At the time of the accident it was the custom for several passenger trains to arrive from the Twin Cities between the hours of 10 p. m. and midnight. Train No. 6 was. due at 10:56 p. m. and this was followed about an hour later by passenger train No. 4. Upon the arrival of No. 6 it would be made up into two separate trains; the one for the Illinois Central, to go out within ten minutes over the switches in the south end of the yard, and the other

for the Iowa Central to go to St. Louis. Immediately upon the arrival of No. 6, the road engine and mail car would be detached, passed to the south over switches, and, after the switches had been cleared and turned for track No. 1 on the west, the engine and mail car would go back over track No. 1 in the clear, where the mail car would be left standing. While there, the brakes would be set on the mail car and the postal clerks would continue to occupy it for the discharge of their duties. The engine would then be detached and passed over the south switches to the main line over which it would pass for a short distance and be switched to track No. 7 and the switch reset, leaving the main line clear for the Illinois Central train. The mail car would remain stationary for about an hour while waiting to be attached to another train. In order to make up the two trains, the switching crew of the yard, composed of Gardiner, the foreman, Gibson, McCann, and the intestate, McGillan, would be engaged in the work of switching, which had to be done with great expedition, in order that the Illinois Central train might pass over the main line on time.

On the night of February 13 train No. 6 arrived nearly on time, stopped at its proper place on the main line, and the engineer turned the engine over to one Engblom, the "hostler." According to the usual custom, McGillan, who had charge of the switching south of the station, cut off the mail car and the engine from No. 6, and they were moved south over the switches and back to their usual places on track No. 1. The engine was then detached from the mail car, upon which brakes were set by McGillan, who stood at his post of duty on the west side of such engine and mail car. The engine was then moved a few feet forward by Engblom, the "hostler," and should have continued on over the south switches. In the meantime Gardiner, with the two remaining men of his crew, had attached a switch engine to the north end of the train, and pulled the coaches onto the side track to the west. While at this place Gardiner saw McGillan at his post on the west, where he was making the cut-off from the mail car and the engine. He also testified that he saw McGillan give the proper go-ahead signal with his lantern, which indicated that the mail car and engine had been detached from each other. On cross-examination, however, he admitted that he only saw the signal at the place where he supposed McGillan to be. It is reasonable to assume that, according

to custom, McGillan, after giving the signal, went between the mail car and the engine, for the purpose of getting upon the engine to ride down to track No. 7 where he was required to open and reset two switches in order to get the main line ready for the outgoing train. This would have been the ordinary custom. Gardiner said that he saw no other signal, but he heard immediately two exhausts, the first indicating that the engine had gone ahead, followed by a louder one as if the engine had been reversed. He says:

> If the engine is reversed, it gives a heavier exhaust than when going the other way, on account of the cylinder is full of steam. Q. What do you mean by that? A. A louder exhaust. You take the engine, start her ahead, and reverse her, and she will give a louder exhaust.

Gardiner after he saw the signal, finished his switching, and within a few minutes thereafter learned that McGillan was "either killed or hurt." He sent McCann to the scene, and when the latter arrived the engine was standing four or five feet south of the mail car and parties were taking the dead body of McGillan from between the mail car and the engine. McGillan's lantern was lying on the ground between the rails. The body indicated that death had been caused by crushing, immediately below the arms.

Respondent's theory is that McGillan was caught between the chafing irons while passing from the west side, and the engine. These irons, one on the engine and the other on the mail car, are at the proper height to have caught McGillan's body at the point where the injury was actually received. There were no other marks or bruises on his person, and the almost inevitable conclusion is that he was crushed between these irons. The mail car was stationary, and Gardiner's evidence in connection with the circumstances justified the jury in concluding that the signal was properly given for the engine to proceed and that after starting the engine it was reversed and backed against the car. In fact the evidence seems to exclude any other reasonable hypothesis.

The order appealed from is affirmed.