# AGNES K. MOORES v. NORTHERN PACIFIC RAILWAY COMPANY and Another.[1]

May 28, 1909.

Nos. 16,077—(66).

**Death by Wrongful Act — Evidence.**

> Evidence considered, and *held*, that it furnishes a reasonable basis for the inference by the jury of the ultimate fact that the death of the plaintiff's intestate was caused by the negligence of the defendant in directing him to fix a hot box on a freight car, and then starting the train without warning before he completed the work.

Action in the district court for Becker county by the administratrix of the estate of Leroy W. Moores, deceased, against defendant company and George Lavoy, to recover $5,000 for the death of her intestate. The answer alleged that the death was caused by the carelessness of plaintiff's intestate or by the risks incident to his employment. The case was tried before Taylor, J., and a jury which returned a verdict in favor of plaintiff for $3,000. From an order denying defendants' motion for judgment notwithstanding the verdict or for a new trial, they appealed. Affirmed.

*C. W. Bunn* and *L. T. Chamberlain,* for appellants.

*M. J. Daly,* for respondent.

START, C. J.

Action to recover damages for the death of plaintiff's intestate, alleged to have been caused by the defendant's negligence while he was in its service as a brakeman on a freight train. Verdict for $3,000, and the defendant appealed from an order of the district court of the county of Becker denying its motion for judgment or a new trial.

The sole question presented by the record is whether there was any evidence reasonably tending to support the verdict. The gist of the alleged negligence as submitted to the jury was that the

[1]Reported in 121 N. W. 392.

deceased was sent by the conductor to repair a hot box on one of the cars of the train upon which he was employed as brakeman, that while in the performance of this duty the train was started by the conductor without warning to the deceased and before he had signaled that he was through with the work he was set to do and was in a place of safety, and that by reason of such negligence he was killed. The evidence is amply sufficient to sustain a finding by the jury that the defendant was negligent, in that the conductor ordered the deceased to go and fix the hot box and then started the train without warning to him, or knowing whether or not he was in a safe place. But whether such negligence was the proximate cause of the death of the deceased is a more serious question.

It is the contention of the defendant that there was no evidence reasonably tending to show any connection between its alleged negligence and the death of the deceased, and that how and from what cause he came to his death is left by the evidence simply a matter of conjecture. Theorize as we may on the subject of proximate cause, it is in its last analysis a question of good common sense, to be solved by a practical consideration of the evidence in each particular case. If the evidence in any case leaves the question whether the negligence of the defendant was the cause of the injury for which damages are claimed a matter of conjecture, the defendant is entitled to a directed verdict. The plaintiff, however, is not required to prove the causal connection between the negligence and the injury by direct evidence, but the evidence must be something more than consistent with the plaintiff's theory of how the accident occurred. If the circumstantial evidence in any case furnishes a reasonable basis for the inference by the jury of the ultimate fact that the alleged negligence was the cause of the injury complained of, it is sufficient proof of the causal connection to support the verdict. Rogers v. Minneapolis & St. L. Ry. Co., 99 Minn. 34, 108 N. W. 868; Johnson v. Lindahl, 106 Minn. 382, 118 N. W. 1009; Flack v. Western Union Tel. Co., 106 Minn. 337, 118 N. W. 1022. The sufficiency of the evidence in this case to sustain the finding of the jury that the death of plaintiff's intestate was caused by the defendant's negligence must be tested with reference to the elementary principles we have stated.

The freight train in question was known as "Extra West," and was bound for Fargo, North Dakota. It consisted of fifty cars, of which the deceased was head brakeman. It started to run west from Staples to Detroit, this state, but stopped about midnight of October 29, 1906, at New York Mills to repair a hot box, then on fire, on the twentieth car from the engine. The conductor and the deceased treated the hot box by supplying it with waste and dope and cooling it in the usual way. It took them twenty minutes to do it, and when the work was done they hung the dope can on the car, evidently anticipating that the box would have to be treated again. Whether the can was hung on the side of the car, or between the cars, does not directly appear from the evidence; but presumably it was on the end, where it could not be knocked off by coming in contact with objects, which would have been the case if hung on the side of the car. The next stop was made at McDougal, the end of the double track from Staples, and six miles east of Detroit. The engine stopped about ten car lengths east of the switch, which here joined the double track to the single one going west, leaving the car with the hot box standing some thirty car lengths east of the switch. The train from the place where it stopped could easily start on down grade.

When the train stopped, the conductor ordered the deceased to go back and take care of the hot box, who dropped off the engine on the right-hand side to go back to the car with the hot box, presumably to carry out the conductor's orders, as he testified. The deceased had his lantern with him. The conductor then went to the station house to see if he could get more time on another train, known as "Passenger No. 4," coming east, and go on west to Detroit. He got it, and then gave the engineer the signal to pull out, without signal or notice to or by any member of the train crew that the deceased was through with the work he was directed to do, and without any knowledge whether or not he was in a place of safety. Upon receiving the conductor's signal, the engineer promptly started the train, and when it arrived at Detroit, six miles away, it was discovered that the deceased was missing. A telegram was sent back to McDougal to look for the deceased. In the meantime train No. 4 went east over the track to McDougal, and after it had passed this station the agent went out to look for the deceased, and found him

dead. His body, fearfully mangled, with head cut off, was lying over to one side of the track near the switch. There were marks between the rails indicating that he, or his dead body, had been dragged or carried from a point two hundred fifty feet west of the switch. Portions of his clothing were found along the track west of the switch, but none east of it; nor were there any indications that the body had been dragged along the track east of the switch. Neither his lantern nor the dope can was found; but the evidence shows that when the train was looked over at Detroit the can was missing from the place where it was hung on the end of the car.

The deceased was never seen alive after he started to care for the hot box.

Counsel for the defendant suggests that: "There is nothing to show that Moores ever went back twenty cars or thereabouts to the place where the hot box was located. The evidence shows only that he started towards the car. There is nothing to show, if he did go back, that the box at the time was hot, or needed any care or attention. There is nothing to show that Moores gave the hot box any care, or did any work upon it of any kind or description. There is nothing to show that, if he did work upon the hot box, he placed himself, in doing so, in any position where the train would run over him if started, as it was in fact unnecessary for him to get in such a position. The work could have been done without that danger. There is no testimony as to any marks of blood upon any part of the freight train."

It was his duty to obey the order of the conductor, and the presumption is that he did. He was last seen going toward the car with the hot box. If the box was not in need of care, why did the conductor give the order? If the deceased did not give the box any care, who removed the dope can from the place where it was hanging on the car? The evidence does not show that the work he was sent to do could have been done without danger to himself if the train started while he was doing it. The conductor testified that there were different ways of doing the work; that some went under the car, if that way was the easiest; that the brakeman would not have to get under the car, unless he happened to stick his legs under; and that he would have to get under the car to do the work, but

outside the rail. It is not clear from the record whether it was necessary for the deceased to go between the cars to get the dope can. Suggestions are also made as to other matters of a negative character. It is significant that among all of the suggestions there is not one which suggests any reasonable and probable hypothesis, in view of the evidence, how the deceased or his body got upon the track at the point beyond the switch and then was carried or dragged back to the point where his mangled body was found, unless he was caught in some way while treating the box by the freight train, and carried beyond the switch, and there thrown lifeless or helpless upon the track, where he was struck by the passenger train going east and carried back to the switch.

This is a border case; but we are of opinion that fair-minded men might well draw different inferences of fact from the evidence as to the cause of the death of the deceased, and that the evidence (taking the most favorable view for the plaintiff), considered as a whole, furnishes a reasonable basis for the inference by the jury of the ultimate fact that the proximate cause of his death was the negligence of the defendant.

Order affirmed.