Coös, }
Feb. 6, 1917. }

EMMA CASTONIA, *Adm'x, v.* MAINE CENTRAL RAILROAD.

The defence of the assumption of the risk of a fellow servant's negligence is not a bar to an action upon the federal employers' liability act (35 U. S. Stat. 65) where the injured employee, after learning of the probability of such negligence, had no reasonable opportunity to quit the service.

Though an employee has been injured when violating a rule prescribed by a railroad for the conduct of its employees, evidence is admissible in an action upon the federal employers' liability act that he was acting in the reasonable execution of the orders of a superior he was bound to obey.

Whether the fall of a freight brakeman from the top of a moving car was caused by a too sudden application of the air brake by the engineer, or by another cause, was properly submitted to the jury in an action upon the federal employers' liability act.

CASE, under the federal employers' liability act, for negligently causing the death of the plaintiff's intestate at Quebec Junction, N. H., September 25, 1914. Trial by jury and verdict for the plaintiff.

There was evidence tending to prove the following facts: Castonia was employed as rear brakeman on the defendant's night freight, running from Coös Junction to Portland, Me. The train was made up by the crew which thereafter operated it and consisted of a heavy locomotive and twenty cars. David Hart was a passenger in the caboose. The train was a little late and left Lancaster at 7.25 P. M. At Moulton's the conductor, Crosby, gave the car seal-press to Castonia, with orders to seal a car which was to be set off at the next station. Castonia did as directed. From this point on, Crosby and the other two brakemen rode on the forward

part of the train. There would be occasion to use the press near the forward end of the train at Quebec Junction, and Crosby expected Castonia to bring it to him there. It is the custom of the men to travel over the tops of moving cars whenever there is occasion to do so.

A rule of the road provides that the rear brakeman must ride in the caboose and remain at the rear to guard that end of the train. The train crew were under the authority of the conductor and bound to obey such orders as he gave.

After leaving Jefferson Junction (the last station before Quebec Junction) Crosby, who was riding on top of the third car from the engine, saw Castonia with his lantern coming over the top of the rear cars. Crosby supposed it was another brakeman, and paid no attention to the matter after a moment or so.

At some point near Quebec Junction the train was suddenly checked by an excessive application of the brakes. The shock threw Hart to the floor of the caboose, and was the most violent he ever experienced. He could not locate exactly where it occurred, but the place where Castonia was found was within the limits Hart testified to.

After the train stopped at Quebec Junction, Castonia did not appear with the seal-press. Search was made and his body was found a short distance up the track, lying outside the rails, with one leg severed and lying between the rails.

An examination of the cars showed blood stains upon the forward trucks of the fifth car from the engine. Upon the top of the same car, near the forward end and upon the slant roof, was a banana peel which had the appearance of having been slipped upon.

There was trouble with the engineer Young when the train was being made up at Coös Junction, and Castonia knew that because of this Young would probably handle the train roughly.

Transferred by *Sawyer*, J., from the April term, 1916, of the superior court upon the defendant's exceptions to the denial of its motions for a nonsuit and a directed verdict, and to instructions that the conductor's orders might modify the written rule.

*Fred W. Baker* and *Sullivan & Daley* (*Mr. Baker* and *Mr. Sullivan* orally), for the plaintiff.

*Drew, Shurtleff, Morris & Oakes* (*Mr. Morris* and *Mr. Oakes* orally), for the defendant.

PEASLEE, J.   The evidence discloses two possible causes for the fall of the decedent.   He might have slipped upon the banana peel, or he might have been thrown by the shock caused by the sudden checking of the speed of the train.   For the former the defendant is not liable, for the latter it may be.   It is argued that there is no evidence tending to show that it is more probable that the shock caused his fall and that therefore the plaintiff's case fails, under the rule of *Deschenes* v. *Railroad*, 69 N. H. 285.   The question presented.is whether there is any evidence from which it could reasonably be found that the shock was the cause of the accident.

The theory that the decedent slipped upon the banana peel rests upon the assumption that he was near the forward end of a car, for that is where the.peel was found.   He must have been projected forward as he fell, because he struck in such a position as to be run over by the wheels of the car.   Had he fallen over the side of the car, instead of the end, it is highly improbable that he would have been touched by the wheels at all, certainly not by those which were almost directly below the place where he would have slipped.

The peel was on the slanting roof of the car, and slipping upon it would naturally start a man toward the down pitch of the roof, that is, toward the side of the car.   It would have no tendency to throw him forward.   He and the train were probably moving at about the same speed, and so far as slipping interrupted his progress it would tend to make it slower than that of the train rather than faster.

On the other hand, the shock of the sudden stopping of the train would throw him forward.   Its natural tendency would be to throw him between the cars rather than over the side.   There is then some probability that the shock caused the fall, and the question whether it did so or not was properly submitted to the jury.   *Boucher* v. *Larochelle*, 74 N. H. 433.

The testimony connecting the shock with Castonia's fall in point of time is somewhat indefinite.   It was dark when it occurred and the witness who testified to it did not look out of the car window. If it were essential to fix the exact time and place of the shock by his evidence alone, the plaintiff's case might fail for lack of proof on this point.   But as it appeared that a shock occurred at about this place and that typical results of a shock were produced at a known location, it is a logical inference that the shock occurred there.

A rule of the defendant provides, in effect, that the rear brakeman shall ride in the caboose and always remain at the rear of the train; and from this it is argued that Castonia was violating the rule

in leaving his station and coming forward. But it also appeared that the trainmen are under the direction of the conductor, and bound to obey his orders; and there was evidence that the conductor had left the car seal-press in the custody of Castonia, that it would be needed for use near the front of the train at Quebec Junction, that the conductor expected Castonia to bring it forward to him, that it was customary for trainmen to travel over the tops of the moving cars, that the train was late, and that if Castonia came ahead before the train stopped it might save time. This would warrant a finding that Castonia was acting in the reasonable execution of the orders of a superior whose directions he was bound to obey. The mere fact that a rigid rule has been prescribed is not conclusive of the matter. *Willis* v. *Company,* 75 N. H. 453.

Under the federal statute, the negligence of a fellow servant is not a defence, but assumption of risk is. The result is held to be that the doctrine of assumption of risk applies to acts of fellow servants in the same way as it does to acts of the master. *Chesapeake &c. Railway Co.* v. *DeAtley,* 241 U. S. 310. From this it is argued that because Castonia knew that the engineer was likely to handle the train roughly that night, therefore the risk of injury from such cause was assumed. But this knowledge came to Castonia just as the train was starting on its trip, when there was no reasonable opportunity to quit the service. It related to the probability of want of care occurring in the future, and not to the result of acts already done. Under these circumstances it cannot be held as matter of law that Castonia voluntarily encountered a known danger which had been created by his fellow servant.

The rule laid down by the federal court is that conduct like that here under consideration does not, as matter of law, prevent a recovery. "The duty of the plaintiff under such circumstances is not to be determined by the single fact of his knowledge of the danger he incurred by continuing to serve with a co-employé known by him to be an unfit and incompetent person. It was enough for the court to say, as it did, that a failure on the part of the plaintiff to refuse to work, in view of that knowledge on his part, might be negligence on his part. The qualification was correct, that it was for the jury to say from all the attending circumstances whether his failure to do so was in fact contributory negligence. A suitable judgment on that question can only be reached by carefully weighing the probable consequences of both courses of conduct, and it might well happen that even at the risk of injury to himself, oc-

casioned by the unskillfulness of his co-employé, the plaintiff might still reasonably be regarded as under a duty not suddenly and instantly to refuse to continue in the conduct of the business of his principal." *Northern Pac. R. R. Co.* v. *Mares*, 123 U. S. 710, 720. The facts in this case were very similar to those in the case at bar, and the decision there disposes of the present contention.

*Exceptions overruled.*

All concurred.