WARD v. DENVER & R. G. W. R. CO.

No. 5973. Decided January 3, 1939. (85 Pac. [2d] 837.)

Rehearing denied May 5, 1939.

566

*Van Cott, Riter & Farnsworth* and *Grant H. Bagley,* all of Salt Lake City, for appellant.

*A. H. Hougaard,* of Salt Lake City, for respondent.

PER CURIAM.

Mamie Ward sued the defendant railroad company as administratrix of the estate of her deceased husband, E. T. Ward, to recover damages for his death. At the time, he was engaged in switching some cars, and, it is alleged, was thrown from one of them, run over and killed. The employment was in interstate commerce, and the action is brought under the Federal Employers' Liability Act, 45 U. S. C. A. § 51 et seq. Plaintiff had judgment and defendant appeals.

The accident occurred in defendant's "Roper" yards in Salt Lake County, Utah, at about 2:30 o'clock a. m. on November 19, 1936. One of the lead tracks crosses this yard in a slightly northeast and southwest direction. On its west side a series of sidings or switch tracks connect with the lead track at their south ends by switches set about 100 feet apart along the lead, and extend northerly thence for an undefined distance. The switches shown on the trial map are numbered from north to south, 10 to 21, inclusive,

and the tracks take the same numbers. The death in question occurred on track 15 at a point about 128 feet north of the frog or switch connection of that track with the lead track.

The complaint alleges that the crew of which deceased was a member had just finished pulling a string of 17 cars out of track 12 and along the lead track south to a point just clear of switch 15 where it stopped. The purpose of the move was to cut off the six rear cars of the string and "kick" them into track 15 under their own momentum. After the "kick" the engine and crew would dispose of the remaining 11 cars according to switching orders. Obeying an order of the foreman of the crew, in the line of his duty, Ward mounted the rear car of the train and of the six cars to be cut off (forward car in the reverse switching movement) as they moved into track 15, for the purpose of setting the brake thereon and bringing the cars to a stop at the proper place.

After alleging in some detail the duty and obligation of defendant company to use care in the matter of its signals governing the movements of the cars, so that Ward might not be injured in performing his duties, the complaint further alleges that after Ward had taken his position on the north end of the then lead car as it was being pushed onto track 15, and while it was moving at a speed of about 20 miles an hour, the defendant and its servants carelessly and negligently did the following things, viz.: (a) Gave the engineer a slow signal without uncoupling the six cars to be cut off; (b) neglected to give Ward any warning that the speed of the cars would be suddenly slowed without uncoupling them; and (c) slowed and decreased the speed of the moving cars suddenly and abruptly so that because thereof and of the slack running through the cars, he was jerked or thrown off the lead car upon the track, run over and killed. Plaintiff then alleges the age, health and earning capacity of the deceased, her own dependency and loss of support and claims damages.

Defendant answered, admitting the employment and service, denying negligence and liability, and pleaded contributory negligence and assumption of risk. At the conclusion of the evidence defendant moved the court for a directed verdict on the ground of absence of evidence of negligence, proximately causing Ward's death, and the presence of evidence supporting its affirmative defenses. The court denied the motion. A verdict, judgment and denial of motion for a new trial followed. Appellant renews its contentions in this court.

The assignments of error are numerous, but these by their nature divide themselves into simpler groupings denoted by subject headings in the briefs. We follow the same groupings in our disposition of the questions presented by the briefs and arguments.

The first question presented is upon appellant's contention that (1) the evidence of negligence was insufficient to take the case to the jury, and (2) that if there were such evidence it is not shown to have been the proximate cause of Ward's death.

The evidence in the record on these questions is substantially as follows:

On the night of the accident deceased was field man of a switching crew of which Bluck, engine foreman; Miranda, pin-puller; Murphy, engineer, and an unnamed fireman were also members. This crew and several other switching crews in the yard were then operating under the orders and supervision of assistant yardmaster McNeil. The latter was standing at his switchman's shanty about opposite switchstand 17 at about the time of the accident. The immediate object of the switching operation by this crew was the making up of an east-bound freight train. McNeil directed Bluck to take his crew and engine down to track 12, drag out the cars there coupled together, bring them south on the lead clear of switch 15, and throw the "sluff" cars in on that track. And bring the remainder, or such of them as were east-bound, back to be assembled in the train

being made up. By "sluff" cars was meant the empties and such loaded cars as were to be cut off. The number and identity of the sluff cars was a matter to be determined by the foreman and crew upon inspection of the cars as they were brought out. The practice usually followed in handling and switching a train of numerous cars was to make a tab, or rough drawing of the train on paper or cardboard, showing the track destination of each car, or group of cars, so as to enable the foreman to determine easily where to make his cuts as the switching proceeds. The tab is usually made in duplicate, one each for the foreman and his pin-puller. This tabbing of a train, while useful, is not always indispensable. An experienced foreman can often do without it and switch from memory if the cuts are not too numerous. The assistant yard-master told Bluck to take his crew, drag track 12, put the sluff cars on track 15, and bring the rest back without undue delay. Bluck complied and pulled the seventeen cars out of track 12 without stopping to make a tab of them. He undertook to do the switching required without the use of a tab. The last six cars of the string were sluff cars, the next two were not, the next two were, and the remaining seven were not.

As the train proceeded south from track 12 on the lead, the engine was ahead pulling the string of cars. Miranda, the pin-puller, boarded the east side of the fifth or sixth car from the rear end of the train, where he would be in position to make the first cut of cars on receiving the proper signal from Bluck. The latter and Ward, his field man, both got on the stirrup of the rear car and rode together down the lead toward switch 15. Bluck told Ward to ride the first cut of cars into track 15, as they were kicked in, and to set the brake when they had gone far enough.

It was Ward's duty, as field man of the crew, to get off at switch 15 and line it with the lead, before mounting the cut of cars to set the brake. As the train proceeded south on the lead track, Ward mistook switch 14 for switch 15, and dropped off at the former switch and began to line it with

the lead. Bluck at once shouted to him, "not 14,—15". Ward then replaced the switch lever in its first position and started walking south toward switch 15. Meantime Bluck himself dropped off at switch 15, gave the "stop" signal to the engineer, lined the switch with the lead, gave the engineer a come ahead signal to back the cars north and then started walking south along the track to meet the approaching cars.

At the time Bluck was lining switch 15 for the lead, McNeil observed Ward walking south along the lead track between switches 14 and 15, and a moment later, as the sluff cars of the cut moved onto track 15, he saw Ward in the act of climbing the east side of the north end of the lead car by means of the stirrup and grab-irons thereon. At that moment he was near switch 15, "within a few feet" of it.

The end car in question was R. G. Car No. 26044, an open gondola car of the kind usually employed in hauling coal. It contained about half a load of cinders. Across its north end, next to the brake wheel and shaft, was placed a board about one foot wide, for use as a brake platform, on which the brakeman stands when applying or releasing the brake. It was to this place that Ward was ascending when he was last seen alive by the night yardmaster, McNeil.

We turn now to Bluck. The evidence is that all night movements of the switch engine and crew are governed by signals from the foreman's lantern. There is a system of signals, each with a definite meaning. The engineer depends on these signals for every movement of his engine. Likewise the pin-puller and field man when not near enough to hear the spoken word.

There is a "kick" signal given to an engineer when it is desired to gather speed rather quickly and cut off one or more cars on the fly. And there is a come ahead signal where the engine is to get in motion and push cars into position without cutting them off while moving. The speed of the engine is governed by the foreman's signals which the

engineer, is practiced to interpret and act upon. The speed of the engine can be graduated to suit the exigencies, and the wishes of the foreman. There is also the "slow" or "easy" signal calling for movement forward or backward slowly and cautiously, as required. We do not enumerate all the signals.

Foreman Bluck, after lining switch 15 with the lead, gave the "come ahead" signal to the engineer to move north upon track 15, and started walking south. The engineer obeyed and started the cars north. It was now upon the foreman to effect his first cut of the cars. But, being without a tab of the cars, he found himself unable to promptly locate his cut. He could not signal his pin-puller ahead where to make the cut. The cars gathered speed rapidly, and presently were going at a speed of 15 to 20 miles an hour, according to Bluck and McNeil, denied by engineer Murphy, who claimed a speed of not in excess of five miles an hour. His accident report said however a speed as high as ten miles an hour. And he testified that he had no independent recollection and based his recollection on the usual speed in such movements.

Bluck then gave a "slow" or "easy" signal to reduce speed, to which he testified that the engineer "immediately responded." Bluck testified that when he gave this "slow" signal he was opposite the fourth or fifth or perhaps the sixth car of the train then going by him at the rate of about 15 miles an hour. From the evidence later discussed he must have been about opposite the fifth car and near switch 16 when he gave that signal. So he had only about a car and a half, or about 60 feet, in which to slow down the train to a speed at which he could find and make the cut. He gave the slow signal quickly, and got quick action, the cars slowing down within about 40 or 50 feet. There is testimony that such a quick slow down could be effected only by quick use of the air brakes which would produce a sudden and severe jerking by reason of the slack running through the cars from the engine to the north end of the train. The cars

were being pushed. When suddenly slowed by the engine brakes the slack would run out to the end, producing a jerk at the last car. The ·testimony of two witnesses is that it was brought down to the speed of about six miles an hour. It was at the moment of this slow signal, plaintiff contends, that Ward was thrown from the rear end car down upon the track 15, and run over. Measurements tend to confirm the contention. It was after McNeil saw Ward climbing the lead car No. 26044 at switch 15 that this slow signal was given and the speed reduced. McNeil testified:

"After Bluck gave this slow signal I knew good and well he didn't know where his cut was. If he had known he would have given his pin-puller the sign for the number of cars he wanted. In view that he didn't know where his cut was, he just let the cars come down to him after he had given the proceed signal."

Also:

"There are several things he could have done. He could have shoved the cut, or he could have stopped them and walked up and checked the cut. It was just a question of which one he wanted to do. He was working that engine at that time."

McNeil also said that he saw Ward mounting the east side of the north end of car No. 26044 at or about switch No. 15, as it passed that point. There was some impeaching evidence regarding McNeil's signing a report to the claim agent stating facts differently from the testimony which he gave in the case but that was for the jury.

We have referred to the evidence of a "slack" action running through the train immediately after the slow or easy signal was given by the foreman to the engineer. There is some room for a difference of opinion, upon all the evidence, as to the extent, effect, or severity of this slack movement. A number of witnesses testified as to its possible or probable effect, based upon their own experience in similar switching movements. Much of it was in response to hypothetical questions. The questions were not framed uniformly to contain precisely the same elements or combinations

of facts. The respective counsel each attempted to embrace a statement of the facts as they contended them to be. The jury had before it the testimony as to the probable speed of the engine and as to the suddenness of the slowing up of the cars right after the slow or easy signal was given. If the jury believed plaintiff's witnesses they were warranted in believing that the speed of the engine was suddenly and abruptly reduced, within little more than a car length, from a speed of 15 or 20 miles an hour to that of about six miles an hour; that the slack ran through the cars quite quickly; and that its effect was to produce a jerking motion at the rear, which may have been quite severe, likened by some witnesses to the action of a whip, its severity depending upon the suddenness of the slowing down of the cars; and that the tendency would be to throw a man off the brake platform of the lead car, unless he had a good hold on something, and most likely into the middle of the track.

Plaintiff introduced a number of witnesses, experienced in switching operations, who testified as to how such a switching movement can be, and ordinarily is, conducted. This testimony tends to explain why it is that, in merely pushing cars to destination, there is usually no need for sudden slowing of the cars, and the difference between that and a "kicking operation." In the instant case there was no kicking movement given to the cars prior to the time Ward must have fallen from the lead car, if he fell. A kicking movement was given very soon thereafter, as soon thereafter as foreman Bluck, after giving the slow signal and cutting down the speed, had found his cut and pulled the pin which permitted the cars to separate. Thereupon he gave a kick signal and the engineer at once kicked the string of six cars down on track 15. But Ward was not involved in that movement unless he was being dragged or rolled along the track under the cars. His fall from the car occurred, if at all, before the kicking movement began, and at or right after the time the slow signal was given. Had Bluck

known where his cut was to be made and signalled to his pin-puller while it was still several car lengths south from him, the kick signal could and would have been given at that time. Bluck did not, at the moment, locate his cut. The cars were picking up speed in response to his "come ahead" signal, and he found himself unable to find and make his cut before it would pass him.

There was testimony from both parties that such a switching movement as was contemplated could have been made either by kicking or shoving the cars onto track 15, without any jerking or unusual movement of the cars, provided that the pin was pulled and the cars uncoupled before there was any slowing or stopping of the engine. There is ample testimony to support a finding by the jury that there was such a rapid slowing of the speed of the train, in response to the foreman's slow-down signal, as would produce a jerking of considerable quickness and severity of the end car on which Ward was climbing when last seen; that such a jerking would be sufficient to throw Ward off the car, and likely upon the track in front of the moving cars; that a man riding the cars for the purpose of setting the brakes would not be anticipating or expecting such a jerk, but he would expect the foreman to get the pin or effect the uncoupling before any slowing of the movement took place. If that were done, the car on which the brakeman was standing or riding would roll away from the other cars of the train without a jerking or unusual movement of any kind.

The evidence is that the cars were not uncoupled when the foreman gave his slow signal for reduced speed; that the failure to uncouple them was due to the foreman's failure to provide himself with a tab of the cars, or to his inability from memory to select the point between cars where the cut should be made, and to his consequent inability to signal to Miranda, his pin-puller, where to make the cut. The jury could conclude that there was negligence in slowing down the cars too quickly after they had acquired a speed

too fast to permit him to make the cut as they passed him. The speed was in response to his signals. The foreman knew, or should have known, that Ward was upon the cars; Ward's duty called him there in obedience to the foreman's orders. He knew, or should have known, that Ward was in a position of danger; that a quick, or too rapid, slowing of the cars might throw him off, by reason of the momentum of the cars; that the slack running through the cars would heighten the risk and the danger. He also knew, or should have known, that Ward would not anticipate any slowing or jerking of the cars at such juncture.

Negligent conduct in terms is defined as "(1) an act which the actor as a reasonable man should realize as involving an unreasonable risk of causing an invasion of the interest of another, or (2) a failure to do an act which is necessary for the protection of another and which the actor is under a duty to do." Restatement, Law of Torts, Vol. 2, sec. 284. Within recognized limits it is the function of a jury to decide whether, under proven facts, negligence or due care has been shown. *Grow* v. *Oregon Short Line R. Co.*, 44 Utah 160, 169, 138 P. 398, Ann. Cas. 1915B, 481.

Under the evidence in the record, it cannot be said, as matter of law, that there was no evidential support for the jury's conclusion that the sudden slowing of the cars jerked Ward off the train and that such jerking was negligence. That there was no eyewitness as to when Ward actually reached the top of the end car, or when he went off of it, is not a sufficient objection. Facts and circumstances often speak more convincingly than words. Assistant Yardmaster McNeil saw Ward get upon the stirrup and begin climbing the side of car No. 26044 by its grab irons on the east side of the north end, just a few moments before that end of the car reached the point at which his lantern struck the ground as it fell, and from whence the parties agree in their briefs his body must have been rolled along the track.

The following cases involve similar facts. In none of them was there an eyewitness to the accident: *Chicago, Rock Island & Pacific R. Co.* v. *Ward*, 252 U. S. 18, 40 S. Ct. 275, 64 L. Ed. 430; *Texas & Pacific R. Co.* v. *Behymer*, 189 U. S. 468, 23 S. Ct. 622, 47 L. Ed. 905; *Choctaw, Oklahoma & Gulf R. Co.* v. *McDade*, 191 U. S. 64, 24 S. Ct. 24, 48 L. Ed. 96; *Saar* v. *Atchison, Topeka & Santa Fe R. Co.*, 97 Kan. 441, 155 P. 954; *Ft. Worth & D. C. Ry. Co.* v. *Stalcup*, Tex. Civ. App., 167 S. W. 279; *Devine* v. *Chicago, R. I. & P. Ry. Co.*, 266 Ill. 248, 107 N. E. 595, Ann. Cas. 1916B, 481; *Castonia* v. *Maine Central R. R.*, 78 N. H. 348, 100 A. 601; *Chicago, R. I. & P. R. Co.* v. *Owens*, 78 Okl. 50, 186 P. 1092; *Chesapeake & Ohio R. Co.* v. *Smith*, 6 Cir., 42 F. 2d 111.

Appellant cites the following cases: *Gulf, M. & N. R. Co.* v. *Wells*, 275 U. S. 455, 48 S. Ct. 151, 72 L. Ed. 370; *Chicago M. & St. P. R. Co.* v. *Coogan*, 271 U. S. 472, 46 S. Ct. 564, 70 L. Ed. 1041; *Pennsylvania R. Co.* v. *Chamberlain*, 288 U. S. 333, 53 S. Ct. 391, 77 L. Ed. 819; *Chesapeake & Ohio R. Co.* v. *Thomason*, 6 Cir., 70 F. 2d 860, 862; *Morrissey* v. *Union Pacific R. Co.*, 68 Utah 323, 249 P. 1064; *Slocum* v. *Erie R. Co.*, 2 Cir., 37 F. 2d 42; *Christensen* v. *Oregon S. L. R. Co.*, 35 Utah 137, 99 P. 676, 20 L. R. A., N. S., 255, 18 Ann. Cas. 1159.

The facts of the first cited cases are similar to the facts of the instant case. The cases cited by appellants are unlike and remote.

Appellant contends that Ward could not have been thrown from the car at the place where his lantern fell and was found,—128 feet north of switch 15. A careful check of the details of the evidence demonstrates to us that reasonable deductions from that evidence would justify a conclusion by the jury that he could have been lurched forward so as to strike in the vicinity where his lantern was found. Especially is this so if Bluck was abreast of the fourth or fifth car when he gave the signal which is what he testified to although it makes some conflict with his other testimony that he was about 40 feet south of switch 16 at the time.

Ward's body when found was lying under the south truck of the south car of the last two put on track 15 by Bluck's crew. Burleigh notified McNeil and the latter made a cursory inspection to see if Ward was dead. Finding that he was, he made no examination for cuts or bruises further than to observe that he had not been run over and mangled by the wheels. The body was lying near the west rail, the feet veering or twisted a little toward the center of the track, face down. Overalls up nearly to the knees. Overcoat or top coat torn in the back. A rubber off of one shoe. McNeil walked along the side of the six cars and of the two cars, to look for blood or signs of clothing on the wheels and found none. Ward's lantern was found on track 15 at a point 42 feet south of his body (47 ft. 8 inches by another witness). Close to the lantern was found a dent in the cinders on the track, described by McNeil as a perfect print of about a quarter of the bottom of the lantern, where it had "hit with force." The lantern was "bent up" at the bottom corresponding with the dent in the cinders where it was believed to have struck when it fell from Ward's hand as he fell. Nearby were his cap and gloves. His bill-fold lay on one of the gloves. The distance from these articles to the spot where Ward's body was found is accounted for on the theory that the body was dragged or rolled under the cars that distance.

In this connection the evidence is that the axles of the cars are high enough to have passed over the body when lying prone or stretched out upon the ground. The knees, back, or shoulders may have protruded up into collision with the trucks or brake-rigging, which may have levelled him out in passing over him. The brakes are attached mechanically to the trucks and the bottom rods of the brakes project downward to a point at which there is a clearance of about $2\frac{1}{2}$ inches, or not more than three inches, above the top level of the rails. The latter are 85 pound rails, and their height, including the tie plate, is six inches above the cross ties. That would leave a clearance of $8\frac{1}{2}$ or 9 inches above

the ties if the track was cleaned out. But the evidence is that at and near the place of the accident, the track was not cleaned but filled with cinders practically to the level of the rails. Hence there was only a little over 2½ inches clearance beneath the brake rods.

It is shown that the bottom rod of the brake projects to one side and to within 16 inches of the rail at one end of the car, and the brake on the other truck at the reverse end of the car goes to within a like distance of the other rail. The rails are four feet 8 inches apart, or 56 inches. Deduct the two 16 inch spaces, total 32 inches, and the width of the bottom rods of the brakes, from 56 inches, and there is left in the center of the track a clearance space of something less than 24 inches between the inner surfaces of the brake riggings, if they were set directly opposite each other. Being at opposite ends of each car, a human body, on being pushed aside by the brake rigging at the front end of a moving car, would almost surely come into contact with the brake rigging on the rear truck as it came along. And that in turn, after dragging or thrusting it about, would leave it in the line of travel of the front brake rigging of the next car. And that in turn would thrust it in front of the next one, and so on alternatively until each car had passed over it. It is difficult to conceive that this process would not have produced broken bones, bruised and contused flesh, and possible lacerations. A post mortem examination by competent authority would have cleared this up and perhaps thrown light upon the cause of any abnormalities. No evidence of any such examination of the body was produced, and the evidence otherwise as to the condition of the body is meager. Aside from what McNeil testified, there is but a scant reference to the subject in the testimony of Mrs. Ward, widow of the deceased. In response to questions by her counsel she testified that she first saw the clothing worn by the deceased at the time of the accident, some four or five days later at the undertaker's. That the back and sleeve of the overcoat were torn, and that there was a stain in the back, brown

or muddy in color, resembling dry blood, which was not there before the accident. And the heel was nearly off of one shoe, hanging to it by a string.

Reverting now to McNeil's findings at the time and place of the accident, he testified that from the place where the lantern was found on the track north to where the body lay under the south truck of the last two cars placed there by Bluck's crew, there were marks in the cinders that looked as if the body had been rolled along the track under the cars, scattering the cinders about. It was clear to him that they were not scattered by the wind, and that it would have to be done by a force of some kind. In this connection our attention is again called to the typewritten statement, exhibit No. 1,—the one given by McNeil to the claim agent Fitsgerald on the morning of the accident. It is lengthy. In one part of it appears this statement:

"I found no signs whatever of any accident, and no signs that Mr. Ward had been dragged at all."

This statement is, upon its face, a contradiction of the witness' testimony to the contrary above noticed. Had there been no other evidence supporting McNeil's testimony that there were signs of a body being dragged along the cinders upon the track, or if the physical conditions as testified by other witnesses controverted it, this statement in exhibit 1 must have been entitled to some weight as impeaching evidence. But no other witness testified in contradiction of McNeil although Bluck, Burleigh, and other railroad employees were on the ground at the time and could, if able to do so, have denied that there were such signs of dragging along the cinders of the track. It would seem difficult to understand how a man's body could be dragged, pushed or thrust about by the under-rigging of the brakes on these eight cars without disturbing and stirring up the cinders noticeably. Appellant's counsel express the same view in their brief where they say:

"There were marks in the loose cinders extending from the point where the lantern lay to the place where the body was found, which a witness described as indicating that something has been rolled." P. 4.

And again counsel say: "* * * The evidence indicated that the body had been rolled 47 ft.," (p. 52), that is, the measured distance from the lantern to the body. In view of all of which we cannot say that the jury were not justified in treating McNeil's testimony as not discredited by the statement contained in the written exhibit No. 1.

The testimony of one witness shows that in the lower projection of the under rigging of the brakes is a pin or bolt with a hole in the end of it, and through that is a cotter-pin to hold the mechanism in place. That is also shown in one of the photographic exhibits. If the points of one of these cotter pins had caught in Ward's overcoat or topcoat, it might have produced the torn place in the back and sleeve of the garment.

The defendant at the trial sought to repel these proofs and inferences by evidence intended to show that Ward never was upon the top of car No. 26044, in fact, and so could never have been jerked off or rolled under the cars. It was shown that at some time after Ward's dead body was found, but just how long afterward is not shown, Bluck went upon the brake platform of the car No. 26044 to investigate. He found that the brake had not been set, but the ratchet and dog meshed perfectly, and there was no defect in the mechanism. This tended to show that Ward had not set the brake, but did not show that Ward had not been jerked off after getting upon the brake platform and before attempting to set the brake. Ward would not set the brake until the car had gone down the track a few hundred feet further, so as to make room for three or four more cars to be switched in after those he was on.

It was shown that on the night of the accident the weather was clear and cool and there was a "light frost on the ground and equipment" at the time. Bluck testified that when he went upon the brake platform to investigate he

found no marks on the frost to indicate that Ward had been there. The brake platform was a light colored board about a foot wide, and at night one might not with a lantern see foot marks or handmarks as easily as in the day time. Nor was there evidence that a foot or hand would make a mark in the light frost at the time. Evidence favoring the view that such marks would be made, would have been by Bluck testifying that his own hands or feet made observable marks in the frost when he himself went upon the platform later. He did not so testify.

In the case of *Tremelling* v. *Southern Pacific Co.*, 51 Utah 189, 170 P. 80, 83, we had before us evidence of this nature, but of a more substantial and convincing character. There, Tremelling was standing in the stirrup of a freight car of a train as it traveled along. He had hold of one of the grab-irons, leaning away out and looking down at the wheels for trouble with a hot box. It was claimed that while in that position the back of his head came in contact with a side or end of a large steel box-car on a siding where the latter approached near the main line, smashing his skull. His body was found on the ground partly under the side of the steel car. The accident occurred Dec. 15, 1915. The weather was cold and the ground frozen. All agreed that there was a "heavy frost," and that the frost on the steel box-car was from a sixteenth to an eighth of an inch thick. Also that any object or person touching the frost on the car disturbed and interfered with it, so it could be easily seen that something had contacted the car. It was past nine o'clock in the morning, and experiments were made in broad day-light, and also an examination of the car to see whether any one or anything had touched the car and disturbed the frost on it before the experiments were made. The results showed there were no prior markings in the frost, but markings did occur wherever the frost was touched in the experiments. We held that the assumed fact that the deceased's head had come in contact with the car was not shown.

· In the instant case the frost was not 'heavy but light. It was night time, not day-light. No experiments were made as in the Tremelling Case, to show whether the frost would show markings from a person's hands or shoes, or did show any from Bluck's movements there. Hence there is no compelling inference in appellant's favor from Bluck's testimony on this point, that Ward had not been upon the brake platform that night.

It is however urged that the evidence must exclude every reasonable inference that Ward could have been killed in some other way than, as claimed, by being jerked off the car and run over. We think the evidence in the record satisfies that requirement. A considerable number of cases have been cited to our attention on this point by counsel for both sides. We have given them all consideration, and some additional cases by citation from the opinions in the cases cited in the briefs. As usual in such disputed questions as this, the value of precedent is in the similarity of the facts cited to the facts in the case in hand, and the pertinency and value of the attempted comparison of the reasoning and factual as well as legal deductions to be made from the cases cited.

It is argued that it may be reasonably inferred that Ward came to his death in either of several ways, such as: (1) That he got off the six cars, walked back and was struck by the two cars; (2) that he was killed while trying to prevent the two cars from coming in contact with the six; (3) that he was seized with a fainting spell or other attack and was run over by the two cars; (4) that he stumbled and fell between the rails and was run over by the two cars; (5) that he could have died or been killed without being struck by any cars at all; (6) that he might have perished in other and unmentioned ways.

There is no reasonable basis in the evidence for any of these suggested possibilities.

"In the absence of direct testimony, the simple suggestion of theories by the defense does not reduce the jury to mere speculation, and dis-

qualify it from determining the cause of the injury complained of."
*Wabash Screen Door Co.* v. *Black*, 6 Cir., 126 F. 721, 725; *Kulp* v.
*Chicago, St. Paul, etc., R. Co.*, 8 Cir., 88 F. 2d 466, 472, and cases there
cited.

"Fact that hypotheses incompatible with defendant's liability may
be conjectured or imagined affords no reason for reversal of verdict
and judgment, supported by testimony, in plaintiff's favor, when such
hypotheses are not based on any testimony." *Sears Roebuck & Co.* v.
*Peterson*, 8 Cir., 76 F. 2d 243, 244 (Syl. 7).

"Jury may not base a verdict on mere speculation. Court should not
indulge in mere speculation as to possible defense, unsupported by any
proven facts, in submitting question of defendant's negligence to
jury." *Id.* (Syl. 8 and 9); *Edwards* v. *Clark*, 96 Utah 121, 83 P. 2d
1021.

In *Myers* v. *Pittsburgh Coal Co.*, 233 U. S. 184, 34 S. Ct.
559, 58 L. Ed. 906, the trial court entered judgment upon
the verdict of a jury. The Circuit Court of Appeals, 3 Cir.,
203 F. 221, reversed it, for

"want of definite proof as to the manner with which Myers came to
his death,—whether by contact with the wire, or, if so, whether that
merely disabled him or he was only injured or stunned by the fall, was
seized with vertigo or other sudden sickness and fell from the car for
that reason, or lost his foot by some unexpected movement of the train,
or voluntarily got off the car and stumbled and fell upon the track,
or became bewildered in the dark, and mistakenly supposed himself
to be in a place of safety." [page 561.]

But the Supreme Court of the United States overruled
these imaginary hypotheses and held that the trial court
properly submitted the case to the jury.

The case of *Moores* v. *Northern Pacific Railway Co.*, 108
*Minn.* 100, 121 N. W. 392, is similar in its facts to the in-
stant case, as to marks on the track showing where the body
had been dragged by the cars, though no one saw him fall
beneath the cars. A judgment upon the jury's verdict was
sustained.

Likewise in *New York Central R. Co.* v. *Marcone*, 281
U. S. 345, 50 S. Ct. 294, 74 L. Ed. 892, where there was no
eye witness, but the physical facts and their inferences were
held to sustain the verdict of the jury.

*Tremelling* v. *Southern Pacific Co.*, 51 Utah 189, 200, 170 P. 80, was a case not where there were equal inferences as is sometimes mistakenly said, but where there was no basis for any inference. If there is a basis for two or more inferences the jury must decide which is the correct one. The evidence in this case presents a basis for finding negligence and a basis from which it may be inferred that that negligence caused the death.

Appellant suggests that since the action is under the Federal Employers' Liability Act, 45 U. S. C. A. § 51 et seq., the kind and amount of evidence to prove negligence must conform to the standard set by the decisions of the Federal courts. There is more than a scintilla of evidence in support of the jury's verdict in this case, and there is no detail or feature of the evidence as to negligence on which this case turns, wherein the federal court decisions require a stronger showing than do the state courts in similar cases.

It is urged that the trial court erred in permitting testimony for plaintiff showing that switching movements, like that of which complaint is made in this case, can be and usually are performed without a sudden slowing or stopping of the cars and without the consequent jerking due to slack action, or otherwise. Such evidence ■ is proper as we have held in *Dickert* v. *Salt Lake City R. Co.*, 20 Utah 394, 59 P. 95; *Myers* v. *San Pedro, L. A. & S. L. Ry. Co.*, 39 Utah 198, 116 P. 1119.

*Assumption of Risk.* Appellant urges that even if there was negligence in the slowing down of the cars after Ward got on them, yet he assumed the risk of any danger therefrom and cannot recover. We have held that the evidence of the employer's negligence was sufficient to take the case to the jury. The jury's verdict settles that ■ issue in favor of the plaintiff. The law is well settled that, while an employee assumes the ordinary dangers and risks of his employment, he does not assume the unusual or extraordinary risks or dangers due to his employer's negligence, unless these were so obvious that in the exercise of

due care he should have known of and appreciated them. Nor does he assume such risks as are latent, nor such as are only discoverable at the time of the accident. *Chicago, Rock Island & Pacific R. Co.* v. *Ward,* 522 U. S. 18, 40 S. Ct. 275, 64 L. Ed. 430; *Roach* v. *Los Angeles, etc., R. Co.,* 74 Utah 545, 280 P. 1053; *Texas & Pacific R. Co.* v. *Behymer,* supra; *Reed* v. *Director General, etc.,* 258 U. S. 92, 42 S. Ct. 191, 66 L. Ed. 480; *Chicago, Rock Island & Pacific R. Co.* v. *Owens,* 78 Okl. 50, 186 P. 1092, 1097; *Fox et al.* v. *Lehigh Valley R. Co.,* 292 Pa. 321, 141 A. 157; *Montgomery* v. *Baltimore & Ohio R. Co.,* 6 Cir., 22 F. 2d 359; *Chesapeake & Ohio R. Co.* v. *Proffitt,* 241 U. S. 462, 36 S. Ct. 620, 60 L. Ed. 1102; *Perrin* v. *Union Pacific R. Co.,* 59 Utah 1, 201 P. 405.

In the Ward Case, supra, the facts as to the negligence of the employer, the verdict and judgment, were a close parallel of the facts in the instant case. It was there held by the Supreme Court that the defense of assumption of risk was, in the circumstances, unavailable. We think there was no evidence of assumption of risk resulting from the sort of quick jerky stop which the jury must have concluded took place. The evidence of defendants on hypothetical questions embracing in their scope the entire trip of the cars from track 12 and back into track 15, cars coming a little too fast, inability to make the cut, slowing down and subsequent "kicking" to destination, elicited a "yes" answer to a farther question as to whether such movements were common or usual in the Roper yards. But these hypothetical questions did not distinguish between a quick sharp, jerky stop and a slow safe one which is the very difference on which negligence revolves.

There was no evidence on which to submit the defense of assumption of risk. The requests for jury instruction on the subject were properly refused. Nevertheless the trial court did, of its own volition, fully instruct the jury on the law of assumption of risk, and appellant has no ground for complaint.

Appellant complains of so much of Instruction No. 7-10 2 as tells the jury:

"* * * if you find from the evidence that Ward was directed by the foreman to climb the cars in question; that he did so in obedience to said directions; that he fell from one of the cars by reason of an unusual or unexpected slowing of the movement, if such was the proximate cause of the accident, it would constitute negligence on the part of defendant for which the plaintiff would have the right to recover damage."

on the ground (1) that it is not unlawful, in the absence of a statute or ordinance, to slow down cars in switching them. This point is not well taken. In order that an act may be negligent because imprudent, in the circumstances, such act need not also be unlawful because prohibited by statute or ordinance. Negligence is usually a question of fact for the jury upon the instructions of the court and the evidence. *Grow* v. *Oregon Short Line Ry. Co.*, 44 Utah 160, 169, 138 P. 398, Ann. Cas. 1915B, 481. The quoted instruction is further criticized on the ground (2) that it omits to mention the defense of assumption of risk, and so errs against the rule requiring the inclusion in such an instruction of every material element in the question of negligence or due care as disclosed by the evidence. We have seen that there was no evidence on which to rest the defense of assumption of risk. Even though there may be evidence on which the question of assumption of risk should go to the jury, other instructions and the balance of Instruction No. 2 made it sufficiently plain to the jury that a finding that Ward had assumed such risk would defeat recovery. The fact that such defeative element was not included in the quoted portion of Instruction No. 2 is therefore not prejudicial error. Long trials cannot be overturned because there may be omissions in one instruction even though such omissions are material when under all the instructions the jury was sufficiently apprised that it was a necessary factor for them to consider. Nor does the evidence exhibit any other modifying element in the question of negligence or due care,

which might have influenced the jury verdict if included in the instruction. Hence the objection on this ground must also be overruled.

Appellant objects to so much of paragraph 3 of the court's instructions as tells the jury that if they believe [from the evidence] Ward came to his death as a result of the negligence alleged in the complaint, the verdict should be in favor of the plaintiff. We believe the bracketed words, supra, are within the fair import of the instruction. ■ The objection is that the jury was thereby required to determine what negligence was alleged in the complaint. The point is not well taken. The court had already, in its Instruction No. 1, told the jury what acts of negligence were alleged in the complaint, and what denials and defenses were contained in the answer. And, in Instruction No. 2, that the jury must decide the issues from the evidence. Also as to the burden of proof upon each issue.

Appellant complains of the court's refusal to give its request No. 7 that plaintiff must prove that the cars were slowed and jerked with more than ordinary severity. We have disposed of this contention. Request No. 7 was erroneous for the same reason. Requests Nos. 2, 3, ■ 17 and 23 were properly refused. They present a theory based on mere conjecture and not upon evidence as to the cause of Ward's death.

Appellant contends there was error in the court's Instruction No. 7 on the measure of plaintiff's damages as follows: ■

"If you find the issues in favor of the plaintiff, you should allow such sum as will reasonably compensate her for the loss she has sustained by reason of the death [of her husband].

"In determining the amount of damages you should consider the age of the deceased at the time of his death, the condition of his health, his earning capacity, the loss of his services about the home, the amount he might reasonably be expected to have contributed to her support during the remainder of his life, the duration of which is shown by the expectancy tables in evidence. The amount could in no

event exceed that for which the plaintiff prays judgment in her complaint."

Appellant contends that this instruction offends against the rule as to measure of damages under the Federal Employers' Liability Act, 45 U. S. C. A. § 51 et seq. The Act limits recovery to the actual pecuniary losses suffered which are defined to be:

"The present cash value of the future benefits of which the beneficiaries were deprived by the death, making adequate allowance according to the circumstances, for the earning power of money, is the proper measure of recovery in an action against an interstate railway carrier under the employers' liability act." Headnote to *Chesapeake & Ohio R. Co.* v. *Kelly,* 241 U. S. 485, 36 S. Ct. 630, 60 L. Ed. 1117, L. R. A. 1917F, 367; *Chesapeake & Ohio R. Co.* v. *Gainey,* 241 U. S. 494, 36 S. Ct. 633, 60 L. Ed. 1124. See, also, the following cases in which the same question is discussed; *Michigan Central R. Co.* v. *Vreeland,* 227 U. S. 59, 33 S. Ct. 192, 57 L. Ed. 417, Ann. Cas. 1914C, 176; *American R. Co.* v. *Didricksen,* 227 U. S. 145, 33 S. Ct. 224, 57 L. Ed. 456; *Gulf, Colo. & Santa Fe R. Co.* v. *McGinnis,* 228 U. S. 173, 33 S. Ct. 426, 57 L. Ed. 785; *Kansas City S. R. Co.* v. *Leslie,* 238 U. S. 599, 35 S. Ct. 844, 59 L. Ed. 1478; *Gulf, Colo. & S. F. R. Co.* v. *Moser,* 275 U. S. 133, 48 S. Ct. 49, 72 L. Ed. 200; *Norfolk & Western R. Co.* v. *Holbrook,* 235 U. S. 625, 35 S. Ct. 143, 59 L. Ed. 392.

It is urged that the instruction authorized the jury to go beyond the rule of damages recognized in these cases and allow damages for any kind of loss, such as loss of the society of plaintiff's husband, loss of conjugal relations, and and any other matter considered detrimental. We do not find it so held in any of the cited cases upon an instruction like that here criticised. The cited cases limit recovery to pecuniary losses but do not condemn an instruction worded as above as authorizing a recovery in excess of the rule. Besides, as appears by this record, the instruction as at first framed by the court did expressly name and include as a recoverable element of damage the plaintiff's "loss of the society" of her husband. But the inadvertence was promptly corrected and the quoted words stricken out at the request of plaintiff's attorney. Thereupon the instruction

was given as it now stands. Thereby the jury's attention was expressly directed to the fact that such an element could not be considered in arriving at their verdict.

The remaining factors in the instruction are all pertinent to an estimate by the jury of the pecuniary losses alone. A husband's services in the home often have a pecuniary value which it would cost money to replace, such as chores, marketing, and the like. In this case the evidence is that plaintiff and her husband had bought a little place eight miles out in the country where they had cows, chickens, pigs and a garden, and raised alfalfa; that the deceased did the work in attending to the pigs, chickens, etc., besides his railroad work; and that when not on duty with the railroad he worked on the place. All this work has a pecuniary value.

In this case there were no children of plaintiff and the deceased. Where there are children it is recognized by the Supreme Court of the U. S. in *Norfolk & Western R. Co.* v. *Holbrook,* supra, that their care, training, instruction, advice and guidance by the father may be considered by the jury in estimating the pecuniary losses from his death. In the absence of children Ward's work and services about his home place, as shown in the above testimony, have a pecuniary value more easily measurable in dollars and cents than that involved in the rearing and training of children. The food value of the pigs, chickens, cows and garden in supplying the family table and augmenting its income have a money value as well as the monthly railroad earnings.

It is, however, further objected that the instruction is faulty in requiring the jury to estimate the amount of the probable contributions by the deceased to plaintiff's support during the remainder of his life expectancy, had he lived, without making any deduction for the value of a present lump sum. In *Chesapeake & Ohio R. Co.* v. *Kelly,* supra, the Supreme Court of the U. S. says that the putting out of money at interest is now so common a matter that it cannot be excluded from consideration in determining the present

equivalent value of future payments. And in *Gulf, Colorado & S. F. R. Co.* v. *Moser,* supra, it was said that the Federal Employers' Liability Act, 45 U. S. C. A. § 51 et seq., has so frequently been construed to require such computation that such interpretation had become an integral part of the statute. Conceding this, as we do, does the instruction as given offend against such interpretation? We think not. It tells the jury, if it finds for the plaintiff, to allow such sum as will *"reasonably compensate her"* (Italics added) for the loss she has sustained by the death of her husband; and it then tells the jury what elements it may consider in estimating such losses. In the case of *Louisville & Nashville R. Co.* v. *Holloway,* 246 U. S. 525, 38 S. Ct. 379, 62 L. Ed. 867, a similar instruction was given, and on error assigned, the Supreme Court held that the instruction though general was correct, and did not imply that the verdict should be for the aggregate of benefits payable at different times without allowing for their prepayment in lump sum at one time. It was held that the instruction bore rather a contrary interpretation in that it was expressly stated that the sum found should be that which would *"compensate"* the widow. The Supreme Court further held in that case that if the defendant company had desired a more specific instruction on the subject it should have specially requested the same, which it failed to do, but had asked a certain erroneous instruction instead.

In the instant case the defendant submitted no request for special instruction as to the method of computing the present value of future payments; hence it is not apparent how the trial court can be put in error on a point on which it was never requested to rule. This view is supported by other decisions of the Supreme Court of the ▪ United States and of this Court. In the Moser, Kelly and Gainey Cases, supra, special requests for jury instruction on this topic were submitted and it was held error of the trial court to refuse to give them. In the Vreeland, Didricksen, Leslie and Holbrook Cases, cited supra, the

question arose in each case upon a general instruction given by the court upon its own motion, which included elements in excess of actual pecuniary losses from the decedent's death, such as loss of his society and companionship, the widow's grief and sorrow, and the like. No such instruction was given in the instant case, hence those cases do not establish error. To the same effect are the following Utah cases: *McAfee* v. *Ogden Union R. & D. Co.*, 62 Utah 115, 218 P. 98; *Ogden* v. *Hirigaray*, 65 Utah 164, 235 P. 875; *Salt Lake & U. R. Co.* v. *Schramm*, 56 Utah 53, 189 P. 90; *Taylor* v. *Los Angeles & S. L. R. Co.*, 61 Utah 524, 216 P. 239; *State* v. *Chynoweth*, 41 Utah 354, 126 P. 302; *Valiotis* v. *Utah-Apex Min. Co.*, 55 Utah 151, 184 P. 802.

Appellant further contends that by the instruction in question the jury were required to return a verdict on the basis of the life expectancy tables, whereas such tables are only advisory. The criticism does not lie. The jury were told that they might consider the various items enumerated including the showing in the expectancy ■ tables. The verdict returned is not suggestive of undue influence therefrom. The expectancy tables, when considered with proven earnings and all proper deductions, would have yielded a larger verdict than that actually returned by the jury. We find no error in the instructions given or refused by the trial court.

Complaint is made that the verdict of $15,000 is excessive and the result of passion or prejudice. The deceased earned an average of $1,170 per year for the two years preceding the accident which occurred at age 46. We have heretofore consistently held that verdicts will not be disturbed by this court on the ground of excessiveness unless ■ ■ the facts are such that the excess can be determined as matter of law, or unless the verdict is so excessive as to shock conscience and clearly show it to be the result of passion, prejudice or corruption. Such a power is rarely exercised by this court. *McAfee* v. *Ogden Union R. & D.*

*Co.,* supra; *Eleganti* v. *Standard Coal Co.,* 50 Utah 585, 168 P. 266; *Jensen* v. *Denver & R. G. R. Co.,* 44 Utah 100, 138 P. 1185, 1192. Upon a comparison of the facts of this case with those in *Miller* v. *Southern Pacific Co.,* 82 Utah 46, 21 P. 2d 865; *Southern Pacific Co.* v. *Miller,* 290 U. S. 697, 54 S. Ct. 207, 78 L. Ed. 600, the amount of damages allowed by the jury must be regarded as moderate and reasonable.

Other errors are assigned but not discussed in the brief, hence are to be regarded as waived. The judgment of the district court is affirmed with costs to respondent.