SCHLATTER v. McCARTHY et al.

No. 7073. Decided August 23, 1948. (196 P. 2d 968.)

See 5 C. J. S. Appeal and Error, sec. 1562. Applicability of state statutes as affecting application of Federal Employers' Liability Act relating to contributory negligence, assumption of risk, and comparative negligence, see note, 89 A. L. R. 693. See, also, 35 Am. Jur. 949.

For opinion on rehearing see 113 Utah 560, 198 P. 2d 473.

*Farnsworth & Van Cott, Dennis McCarthy,* and *Grant H. Bagley,* all of Salt Lake City, for appellants.

*Rawlings, Wallace & Black, Brigham E. Roberts,* and *Wayne L. Black,* all of Salt Lake City, for respondent.

WOLFE, Justice.

Appeal by defendants from a verdict and judgment for damages for plaintiff in an action by plaintiff for personal injuries sustained by him as a result of negligence on the part of defendants. The parties will be referred to as they appeared in the court below.

Defendants were the trustees of the D. & R. G. R. R. Co., and plaintiff was an employee of defendants at the time he was injured. Plaintiff sustained the injuries complained of when the locomotive he was operating collided with two runaway cars. The action comes within the Federal Employers' Liability Act, 45 U. S. C. A. § 51 et seq. Defendants concede that there was evidence from which a jury could find negligence on their part, and they make no issue as to the question of negligence. It is therefore unnecessary to detail the acts relied upon by plaintiff as negligence, and they will be referred to in this opinion only as they may incidentally appear in relation to questions discussed herein.

The facts, insofar as material here, are as follows:

The accident occurred at Kyune, Utah, on October 9, 1945. Plaintiff was the engineer on helper engine No. 1409, which engine had helped push a freight train from Helper, Utah, to Kyune. Another helper engine, No. 3409, had also been used in helping to push the train from Helper to Kyune. No. 3409 was coupled to the rear of, and was behind, No. 1409. Behind No. 3409 was a box car loaded with tin plate, and the caboose. At Kyune the helper engines were to be taken off the train, the caboose and box car were to be coupled to the rear end of the train, and the train was to continue its westward journey without the two helper engines.

At Kyune, defendants' mainline was connected with two other tracks in the shape of an inverted "Y" or wye. The

diagram below is a map of the railroad yards at Kyune:

The train proceeded about 10 car lengths west of the west leg of the wye. It was determined by the conductor that in order to accomplish the elimination of the helper engines from the train, the box car and caboose should be kicked onto the west leg of the wye, and that the helper engines should then be moved east of the switch on the mainline, and that the box car and caboose should then be

allowed to drift down the west leg of the wye and to couple onto the train.

The west leg of the wye was on a 3½ per cent grade sloping upward from the mainline track toward the "tail" of the wye. Likewise the mainline track sloped downward from west to east, so that the frog was approximately in the bottom of a small hollow or cradle, and both the west leg of the wye and the mainline west of the frog sloped downward toward the frog.

According to plan, the caboose and box car were kicked up the west leg of the wye approximately to its mid-point by engine No. 3409. The brakeman, Jones, rode on the caboose, and it was his duty to set the hand brakes on the cars when their momemtum had run out. Helper engine 3409 proceeded across the switch point and easterly along the mainline track. Helper engine 1409 followed No. 3409 easterly along the mainline tracks. As No. 1409 crossed the switch the two cars which had been kicked onto the west leg of the wye collided with No. 1409, seriously injuring plaintiff, the engineer. The hand brakes had been insufficient to hold the two cars on the steep grade of the west leg of the wye, and the cars had drifted down the west leg of the wye to the point of collision.

The jury returned a verdict of $41,212.44 general damages and $3000 special damages. No deduction was made for contributory negligence. Defendants contend that the evidence showed that plaintiff was guilty of contributory negligence as a matter of law, and therefore the verdict was against law because no deduction was made for contributory negligence. In determining this question, we must view the evidence in the light most favorable to plaintiff.

Both Daley, the conductor in charge of the train, who was at the switch at the time of the accident, and Garner, the fireman on plaintiff's engine, testified that Daley gave plaintiff a stop signal as plaintiff's engine approached the switch. Daley testified that the signal was given when the engine was one to two engine lengths (85 to 170 feet) away

from the switch points, while Garner testified that the signal was given just as the rear or east end of the engine reached the switch points. Plaintiff testified that he did not receive any such signal. Defendants contend that it was the duty of plaintiff to keep a constant lookout for track signals, and that his failure to receive the stop signal was contributory negligence as a matter of law.

Plaintiff admitted familiarity with rule No. 894, which required the engineer to keep a constant lookout for track signals. However, he testified that he was watching for track signals, but at the same time he had the duty to watch out for engine No. 3409, which was proceeding easterly along the mainline tracks just ahead of his engine, and that it was necessary for him to keep an eye on it, so that he would not collide with it.

Plaintiff further testified that when the cab of his engine reached the switch points he first observed the cars coming out of the wye. Both brakeman Jones, who was on the caboose on the wye, and fireman Garner, on engine No. 1409, testified that plaintiff's engine was about at the switch points when the cars started to roll down off the wye. From all of the testimony, the jury could have found that the stop signal was given at about the time the emergency arose, and that plaintiff's failure to receive the signal was not contributory negligence in view of the surrounding circumstances.

Defendants further contend that when plaintiff saw the cars coming down from the wye he did the worst thing possible—he gave the throttle a jerk, thus accelarating the engine and increasing the force of the impact resulting from the collision. In making this contention, defendants rely strongly on evidence introduced by them of certain tests made with respect to engine No. 1409, and the distances within which it could be stopped when travelling at various rates of speed, and also with respect to stopping and reversing it. They argue that if engine No. 1409 were travelling at 10 miles per hour (which according to plaintiff's testimony was the fastest it travelled at any time

during the course of the switching operations then being conducted) that it could have been stopped within 50 feet and reversed and travelled west a distance of not less than 77 feet. Defendants contend that the collision would have been thereby averted or its effect greatly ameliorated.

It is a well settled rule that a person confronted with a sudden emergency who chooses a course of conduct to avoid the danger such as a person of ordinary prudence might make under similar circumstances, is not guilty of contributory negligence, even though it subsequently appears that another course of action might have avoided or ameliorated the injury. The jury could have found that under the emergency conditions confronting plaintiff, it was not unreasonable for him to attempt to get clear of the switch by accelerating his engine, rather than to attempt to stop and reverse the course of his engine.

Even if it be conceded, for purposes of this argument, that plaintiff was negligent in failing to receive the stop signal, the jury might have found that such negligence was not a substantial causative factor in producing plaintiff's injuries. The evidence of the tests conducted by defendants through their agents and servants, although uncontradicted, was in no wise conclusive upon the jury as to what the true facts were. In the first place the tests were conducted by agents and servants of defendants, not by impartial experts. In the second place, engine No. 1409 had no speedometer, and the various speeds of the locomotive during the conduct of the various tests were merely estimates by the engineer conducting the tests, and hence subject to human error. Thirdly, the person who operated the engine during the tests knew in advance what signals would be given and about when and where they would be given, so that the reaction time would be considerably reduced and certainly not the same as for a man who received the signal unexpectedly. Fourthly, there was no showing that the braking apparatus on the train was in the same condition on the day that the tests were conducted as on the day when the accident took place. And

fifth, although the record is not clear on this point, the fair inference is that at the time the tests were conducted there was no other railroad traffic in the Kyune yards, and the person who operated the engine during the tests could give his full attention to track signals, whereas at the time of the accident plaintiff not only had to watch for track signals, but also for other railroad traffic, and especially for engine No. 3409 which was moving on the same track. Moreover, defendants' argument assumes that the locomotive was at least an engine length, or 85 feet, east of the switch points when the stop signal was given, although Garner's testimony was that the east end of the locomotive was at the switch points when the stop signal was given. The jury was entitled to believe the testimony of Garner, rather than that of Daley on this question.

A contention similar to the one here advanced was made in the case of *Union Pacific Railroad Co.* v. *Hadley*, 246 U. S. 330, 38 S. Ct. 318, 319, 62 L. Ed. 751. In that case a train was stopped on the tracks, and it was the duty of the brakeman to flag down approaching trains. A heavy snow storm was in progress at the time, and the brakeman did not perform his duty. Another train crashed into the caboose, killing the brakeman. In an action against the railroad for his death, the jury failed to make any deduction for contributory negligence. In disposing of the contention that the verdict was against law for failure to make a deduction for contributory negligence, the Supreme Court, speaking through Mr. Justice Holmes, said:

"The account of the weather and other circumstances on the plaintiff's side made it possible for the jury to believe that Cradit's duty was so nearly impossible of performance that no substantial allowance should be made on that account. It does not appear that his superior, the conductor, who was in the caboose with him, required him to perform the task. And since the finding was possible on the evidence it cannot be attributed to disregard of duty [by the jury]."

The verdict of the jury was not against law by failure of the jury to make a deduction for contributory negligence.

We turn next to a consideration of defendants' contention that the trial court committed reversible error in admitting in evidence plaintiff's exhibit D, which was a table compiled from mortality and annuity tables. The table was based on the life expectancy of a person 61 years of age (plaintiff's age at the time of the accident) and showed the various amounts of money which discounted at various interest rates ranging from 1½% to 8% would be necessary to purchase an annuity which would pay amounts ranging from $1 to $500 a month. This court has approved the use of such tables in certain cases. *Bruner* v. *McCarthy*, 105 Utah 399, 142 P. 2d 649; *Pauly* v. *McCarthy*, 109 Utah 431, 184 P. 2d 123, 129. But such tables are not admissible in all cases of personal injury, nor even in all cases where the injuries are permanent. The rule of *Bruner* v. *McCarthy*, supra, permitting the introduction in evidence of such tables was carefully limited in *Pauly* v. *McCarthy*, supra. We there said:

"We wish to make it clear that we do *not* hold that in every case where permanent injuries are alleged and evidence in support thereof is introduced, that the mortality and annuity tables are admissible. We go only so far as to hold that where the injury alleged and proved is permanent, *and is of such nature as to indicate a permanent material impairment of a substantial nature in the earning capacity of the plaintiff*, the mortality and annuity tables are admissible."

There can be no doubt in this case that plaintiff sustained very serious personal injuries, and that such injuries will to some extent be permanent in nature. The real question is whether the evidence adduced at the trial would support a finding that the injuries were "of such nature as to indicate a permanent material impairment of a substantial nature in the earning capacity of the plaintiff." The question is not without difficulty. The medical testimony, standing alone, probably would not support the finding. But after a careful consideration of the entire record, we have reached the conclusion that a jury, from the medical testimony taken together with the other

evidence in the case, and particularly the testimony of plaintiff, and viewing it in the light of their knowledge and experience in life, could justifiably have found that plaintiff suffered a permanent and substantial impairment of earning capacity. And since the evidence would authorize that finding, the trial court did not err in admitting exhibit D in evidence.

The accident occurred on October 9, 1945, and the trial of this action took place some thirteen months later.

Plaintiff's right leg was fractured in two places between the knee and the ankle. For about the first seven months after the injury plaintiff was treated by doctors retained by defendants and during this period little progress was made in the healing of the injury. Thereafter, plaintiff was treated by Dr. Clegg, an orthopedist of his own choosing.

Dr. Clegg testified that when plaintiff came to him the upper fracture had healed with a bony union, but with mal-alignment; the lower fracture showed no evidence of bony union and osteomyelitis and pus drainage were present in that area. An operation was performed in which the infection was cleaned out and the bones were properly aligned and set in position. At the time of trial the osteomyelitis was quiescent, and apparently healed, but bony union was incomplete. The doctor planned to graft bone chips from plaintiff's pelvic region across the fracture site. Physiotherapy treatments would also be required.

The doctor anticipated that the proposed operation would be successful, but even if the best possible results were achieved, plaintiff would have *at least* a ten per cent permanent disability to his right leg, including muscle weakness, limitation of movements of the joints in the right knee and ankle, and poor postural balance. Plaintiff would not be able to return to work as a locomotive engineer until about two and a half years after trial, or three and a half years after the accident. There was a possibility that recovery might be delayed and be substantially less complete if the osteomyelitis recurred, or if there was other infection. And

because of plaintiff's age, recovery might be slower and less complete than the doctor hoped.

The doctor was familiar only in a general way with the duties of a locomotive engineer, but assuming a successful recovery, he anticipated respondent would be able to handle moderate work, to walk reasonable distances up to two-thirds of a mile, to walk up and down stairs, and if he exercised care, to perform the various duties of an engineer suggested to him by counsel.

The evidence established with reasonable certainty that plaintiff would sustain a permanent disability to his right leg of at least ten per cent. However, a distinction must be made between a permanent injury and a permanent impairment of earning capacity. The extent of the disability to a limb or other part of the human machine is not generally the measure of the extent of the impairment of earning capacity. A few examples will illustrate: A 50% permanent disability of the left hand of a practicing lawyer would probably not impair his earning capacity to the extent of 50%. He would still be able to interview clients, to read cases, to walk to and from the court room, and to perform all of the other duties ordinarily incident to the practice of his profession. On the other hand, a 50% permanent disability of the left hand of a concert pianist would probably amount to a total impairment of his earning capacity. So also, permanent disfiguring injuries, even of a slight nature, might result in almost total impairment of earning capacity of a professional actress or model, whereas serious disfigurement, unless accompanied by loss of bodily function, would hardly impair at all the earning capacity of a day laborer.

The evidence of plaintiff's ten per cent permanent disability to his left leg, when taken together with the fact that plaintiff would be nearly 65 years of age before he would be able to return to work, and the generally recognized reluctance of employers and especially railroads to engage the services of men in advanced years, particularly when physically handicapped, would justify a jury in finding that

plaintiff might never again be gainfully employed as an engineer or in railroad work for which he was trained. It should be noted here that plaintiff was not trained or qualified to engage in any other gainful occupation. And even if plaintiff were able to return to railroad work, it is fairly inferable that he would not be able to work so many hours as before, due to his weakened condition. It is also inferable that even if plaintiff would be able to return to his railroad work, that he would not be able to continue in employment for as many years as if he had not been injured.

Although the evidence is not as clear and satisfactory as it might be, we think it is sufficient to support a finding of permanent impairment of earning capacity. It was therefore not error to admit in evidence plaintiff's exhibit D, the combined tables.

Defendants have strenuously argued that the rule of *Bruner* v. *McCarthy,* supra, should be overruled, and that the combined tables should not be admitted in evidence in any case. It may be stated here that our experience with the rule as now followed has taught us that such tables are not an unmixed blessing. To a certain extent they tend to mislead the jury. In using these tables, juries tend to select an amount shown on the table very close to the average monthly wages of plaintiff multiplied by the life expectancy of the deceased in months, discounted at current interest rates. Such was apparently done in this case. The general verdict was in the sum of $41,212.44 which is the exact figure which plaintiff's exhibit D shows as the present value of a monthly income of $300 for a man with the life expectancy of plaintiff at the time of the accident, discounted at 2½%. Verdicts for general damages, because of the very nature of the damages for which they are awarded, and the impossibility of fixing exactly the monetary value of the damages sustained, are almost invariably in round figures. It is impossible to resist the conclusion that the jury in this case applied the table as above indicated in fixing the damages. The obvious vice of this procedure is that the jury fails to take into consideration the

possibility of loss of future wages due to sickness, injuries, strikes or other cause, the probability that the employee will retire from active service before his death, and the almost certainty that with advancing age his earning capacity will decrease.

But while we recognize that misuse of the tables by the jury even when properly admitted may result (and in some cases undoubtedly has resulted) in awards disproportionate to the injuries sustained (we do not intimate that such occurred in this case), such tables when properly used by the jury may be of great value in assisting the jury in fixing the damages for loss of income. The calculation of the present value of a monthly income over the period of a life expectancy is no simple mathematical problem. We are not aware of any device, other than these tables, which will accurately inform the jury as to the matters therein contained. The jury should not be deprived of the aid and assistance of these tables, merely because they are susceptible of misuse. Many classes of evidence are held admissible, although they have a known propensity to arouse the prejudice or sympathy of the jury, and to that extent are misleading. The rule of *Bruner* v. *McCarthy*, supra, as qualified in *Pauly* v. *McCarthy*, supra, is reaffirmed.

Defendants also assign as error that counsel for plaintiff argued to the jury that a witness called by plaintiff was not telling the truth. The arguments of counsel to the jury are not in the bill of exceptions before us. All we have is the exception taken by defendant's counsel, which was as follows:

"I must take an exception to counsel making the argument he just has, in which he states to the jury, argues to the jury, that his own witness was not telling the truth. He is not permitted to make any such argument, and I take an exception to it and ask the court to instruct the jury that he has no right to do that, and that they should disregard the argument."

As is almost invariably the fact in a situation of this kind, respective counsel disagree as to just what argument

was being made when the exception was taken. Defendants maintain that counsel argued to the jury that Dr. Clegg, plaintiff's own witness, was not telling the truth. Counsel for plaintiff assures the court that his argument was directed to the testimony of Jones, an eye-witness to the accident, whose testimony differed in some particulars from that of other eye-witnesses also called by plaintiff.

It is the general rule that a party who calls a witness vouches for his veracity, and cannot afterward impeach the witness, either by the testimony of impeaching witnesses or by argument to the jury. The rule is subject to some exceptions, notably where one party must call ▮▮▮ the adverse party as a witness. But a party is not bound by every statement that his witness makes, and he may, by testimony of other witnesses and in argument to the jury, show that the facts were different from those testified to by the witness. This is permitted, not for the purpose of impeaching the witness (although it may have that incidental effect), but for establishing the true facts. It would be a monstrous rule that would bind a party to every statement of every witness produced by him. It is common experience that several eye-witnesses to an occurrence will have different versions of the same transaction. A party who calls several eye-witnesses is entitled to argue before the jury that they should believe the facts to be as testified to by the witness most favorable to him. This is not an attack upon the veracity of the other witnesses called by him whose testimony may be different in some respects from that of others, but merely an attempt to convince the jury that the facts are really as contended by him. On the other hand, a party who has called a witness to help prove his case, and has vouched for his credibility, may not thereafter argue to the jury that such witness is unworthy of belief. See in this connection *Chicago City Ry. Co.* v. *Gregory,* 221 Ill. 591, 77 N. E. 1112; *Town of Waterbury* v. *Waterbury Traction Co.,* 74 Conn. 152, 50 A. 3; *Choctaw & M. R. Co.* v. *Newton,* 10 Cir., 140 F. 225; 6 Jones Commentaries on Evidence, 2d Ed., Sec. 2432, pp. 4814-4816.

Since the arguments of counsel were not preserved in the record, we are hardly in a position to say that the argument of plaintiff's counsel to the jury was improper, and grounds for reversal. Error will not be presumed, nor can we presume misconduct on the part of counsel. The record fails to show that counsel attacked the credibility of his own witness. There is nothing in the record before us on which this court could hold counsel guilty of improper conduct.

The judgment is affirmed. Costs to respondents.

McDONOUGH, C. J., and LATIMER, J., concur.

WADE, Justice (concurring in result).

I concur with the result and generally with the reasoning of the prevailing opinion. But some of the ideas expressed therein I do not share.

The *Bruner* case quoted from in the prevailing opinion does not require proof of permanent impairment of earning capacity before mortality and annuity tables are admissible in evidence. It merely holds that where such is the case such tables are admissible in evidence. And that was all that we were required in that case or are required in this case to hold. Whether all of the requirements that were present in the *Bruner* case are required before such tables are admissible in evidence is not now before us, and I express no opinion thereon.

I do not share Mr. Justice WOLFE's grave doubts that such tables aid the jury in arriving at a just verdict. Where understood and intelligently applied to the facts, even where the injury is not permanent, such tables are of great aid in determining the amount of a verdict. Without some guides the jury has very little knowledge of the amount of damages in a lump sum an injury causes a person. I feel sure that such tables usually produce larger verdicts but I am not prepared to say that they are out of proportion to the injury sustained.

Also, I do not consider the question of whether plaintiff here suffered permanent impairment of earning capacity as being close. I think it requires a strained construction to reach a contrary conclusion. I do not think the doctor's opinion as to how complete plaintiff's eventual recovery will be must be accepted as completely accurate. This man was very seriously injured; after 13 months there is no bony union of the bones of his leg, and the doctor expects serious operations and a long treatment. Under those circumstances the jury could very reasonably conclude that he will never as completely recover as the doctor anticipates.

But even if he does, I think his injuries will obviously permanently impair his earning capacity. The evidence deals with percentage of disability, and the limits of his probable capacity to perform certain bodily functions. It gives no information on his probable capacity or opportunity for future employment. But every day human experience tells us that a cripple is greatly handicapped in obtaining work that he is capable of doing; that railroads and other businesses require certain physical standards for employment, and that the physically handicapped is the last to obtain employment and the first to lose his job, and that his sick time is much greater than the man in perfect health. Under these facts, in my opinion, it would be entirely unrealistic to hold that this man's earning capacity was not permanently impaired by this injury.

PRATT, J., dissents.