## BENNETT v. DENVER & RIO GRANDE WESTERN R. CO.

No. 7287.   Decided January 3, 1950.   (213 P. 2d 325.)

Rehearing Denied March 20, 1950.

58

See 32 C. J. S., Evidence, sec. 738. Personal injuries, excessive verdict in, see note, 102 A. L. R. 1125. See, also, 15 Am. Jur. 627.

*Van Cott, Bagley, Cornwall & McCarthy,* Salt Lake City, for appellant.

*Rawlings, Wallace & Black,* Salt Lake City for respondent.

LATIMER, Justice.

The first part of this opinion is concurred in by all members of the court. The latter part dealing with excessive damages is concurred in by the Chief Justice only, so that the views expressed and the action taken by Mr. Justice Wade, Mr. Justice Wolfe, and Mr. Justice McDonough require an affirmance of the judgment.

This case involves an appeal and cross-appeal from a judgment for damages suffered by respondent while he was employed by appellant as a head brakeman. The cause of action is founded on the rights and liabilities created by the Federal Employers' Liability Act, 45 U. S. C. A. § 51 et seq. The jury in assessing damages awarded respondent $70,000.00, but found his negligence contributed to his injury and diminished the amount by $20,000.00, thereby making the net verdict $50,000.00.

Appellant does not question the sufficiency of the evidence to establish its negligence but in his cross-appeal respondent challenges the jury's finding that he was negligent. Respondent's cross-appeal and assignment of error requires a resume of the testimony and will be disposed of first. The facts necessary to dispose of appellant's contentions will be detailed as each assignment is later considered.

The accident occurred at about 8:30 p. m. on January 7, 1948, in appellant's yard at Buena Vista, Colorado. Respondent was working as head brakeman on an eastbound freight train which consisted of a four unit diesel engine and sixty freight cars. Most of the cars were left on the main line track while switching operations were carried on

in the yard. After a number of switching operations, the train consisting of 14 cars, was located on what was known as the stock or ice house track. Just prior to the time of the last movement of the train, respondent stationed himself in the center and on top of the last car as, according to him, this was the safest position from which he could give the necessary signal. He gave the engineer the lantern signal to move forward and the train moved out to the south. According to respondent's version, the train rapidly picked up speed and at the time he was jolted off was moving at a rate of speed from 12 to 15 miles per hour.

Respondent was required to line the main line switch and preparatory to this he moved forward on top of the car. He was carrying a lantern and brake club. He approached the front end of the car and crouched down to take hold of the grab iron. While in the process of crouching, by what respondent described as "the slack running in causing a violent jerk" he was thrown to the ground and the last car of the cut ran over him causing the injuries which will be referred to later.

The cut of cars was moving down a track which had two curves in it between the place where the train started and the place where respondent needed to be on the ground to throw the switch. Respondent was familiar with the track, knew the presence of the curves, knew that when travelling on a curve there is a lurching and wobbling of the cars and knew the lurching and wobbling would increase in severity. Respondent was a seasoned brakeman and was familiar with slack action.

The United States Supreme Court has in its recent decisions announced the rule that if there exists any evidence from which negligence might be fairly inferred, the question is one for the determination of the jury even though the jury's verdict involved speculation and conjecture. We quote from the case of

*Lavender* v. *Kurn,* 327 U. S. 645, 66 S. Ct. 740, 744, 90 L. Ed. 916:

"It is no answer to say that the jury's verdict involved speculation and conjecture. Whenever facts are in dispute or the evidence is such that fair-minded men may draw different inferences, a measure of speculation and conjecture is required on the part of those whose duty it is to settle the dispute by choosing what seems to them to be the most reasonable inference. Only when there is a complete absence of probative facts to support the conclusion reached does a reversible error appear. But where, as here, there is an evidentiary basis for the jury's verdict, the jury is free to discard or disbelieve whatever facts are inconsistent with its conclusion. And the appellate court's function is exhausted when that evidentiary basis becomes apparent, it being immaterial that the court might draw a contrary inference or feel that another conclusion is more reasonable."

The same rule should be applied against the employee and if from the evidence in this case the jury could fairly infer that the respondent did not use due care in his movements on top of the car then we are not at liberty to set aside its findings.

Respondent was the only witness to his own activities and the jury is permitted to consider his interest in evaluating his testimony. Considering those portions of his testimony favorable to appellant the jury could find that respondent left the position that he considered the safest to proceed to a more dangerous position at a time when the car was entering a curve on the track and when there would be a lurching and wobbling. He could have waited until the car was on the straight-of-way and carried out his duties without delay. He knew the train was traveling at a fast rate of speed for that movement and yet he made no effort to signal the engineer to slow down although his duties required him to control the movement of the train. He knew the faster the train went around the curve the more pronounced would be the forces to hurl him from the car and he knew that the slack action

would be more severe than if the train were moving more slowly.

With these facts to deal with the jury could fairly infer that respondent did not use due care for his own safety and diminish his damages in the proportion in which his negligence contributed to his injuries.

Appellant seeks a reversal upon three assigned grounds of error. The first is that the trial court erred in permitting exhibit G "Computation of Present Value of Monthly Income based on American Experience Mortality Tables" in evidence; second, that the trial court erred in admitting exhibit H, a similar table based on United States Department of Commerce Life Tables; and third, the verdict is excessive and resulted from passion and prejudice on the part of the jury.

We shall treat the first two assignments of error together. We have held in a number of recent cases that exhibits similar to exhibits G and H are admissible in evidence. See *Pauly* v. *McCarthy et al.*, 109 Utah 398, 166 P. 2d 501; *Schlatter* v. *McCarthy*, 113 Utah 543, 196 P. 2d. 968. Appellant concedes this now to be the law in this jurisdiction but founds its present assignments of error on the proposition that a proper foundation was not laid to permit their introduction in evidence.

Verdicts are reaching high levels and counsel in their attempts to establish excessive damages contend that the improper use of these tables by jurors contribute to the astronomical amounts. Even if the assumption made was correct, it would not render the tables inadmissible as the information set out merely furnishes the jury a convenient method of diminishing a present lump sum verdict so as to more accurately estimate an injured persons pecuniary loss and give credit for the earning power of the money obtained.

We see no reason for any one now contending that the American Experience Mortality Tables do not give a usable estimate on the probable duration of a person's life. If we use respondent's expectancy of 457 months as established by these tables and use his earnings as $250.00 per month and assume he has been totally disabled, he has suffered a loss of income over that period of $114,250.00. If the jury awarded him that amount for loss of income he would be granted an amount, which if converted into sound investments, would exceed the total amount of his actual loss. Accordingly, the trial court instructed the jury as follows:

"If you find the issues in favor of the plaintiff, and award him damages, then, with respect to the plaintiff's alleged loss of earning power he would not be entitled to recover as a lump sum at present the total accumulations of such loss of earnings over the entire period of such disability, but such sum, if any, awarded, must be reduced or discounted on the basis of a fair rate of interest or return on such sum.

"It is for you to determine from a preponderance of the evidence what rate of interest or return could fairly be expected from safe investments which a person of ordinary prudence, but without any particular financial experience or skill could make, and reduce or discount said sum at such fair rate of interest or return as you thus determine."

That is an appropriate instruction and for respondent's benefit. However, it is almost impossible for a juror to calculate an appropriate reduction or discount without the assistance of a mathematically computed table. It might be done in a rough manner but there is no reason why a jury should not be furnished with a means of doing it accurately. That is the sole legitimate purpose of the chart.

Were we convinced that there was a consistent injustice to defendants and that jurors were confused and misled by these tables we might be called upon to reverse our previous holdings. However, the fact that verdicts have increased in amounts over the years is not evidence that the juries have been confused and misled by the tables. Neither do

such increases appear to be chargeable to a set of figures included in tables of computations. Perhaps the low purchasing power of money, the economic trends, a better understanding of the damages suffered and a realization that industry and not the state should bear the burden of caring for the injured employee have all contributed to increasing the amount of the verdict.

We said in the case of *Schlatter* v. *McCarthy*, 113 Utah 543, 196 P. 2d 968, that experience had taught that these tables were not an unmixed blessing, and that the vice connected with their use was that the jury did not take certain elements, such as sickness, retirement, loss of time and decreasing earning power into consideration. We did not say that under proper instructions from the court the jury would misuse the tables and not consider these elements. We have no reason to assume that juries will disregard the court's instructions and consistently do injustices to defendants. If the tables have been improperly used it has been because the jurors have not been adequately instructed in how to apply the information contained in the exhibit. If an employee is totally disabled so that he cannot earn, the table accurately reflects his loss of income. If the jurors find his earning capacity has been permanently reduced by 50% then all they need do is apply the percentage of loss to the appropriate figure.

The foundation for admitting these exhibits in evidence was furnished by an investment counselor and a certified public accountant. The former testified that a person without experience could safely invest money at an interest rate of from 2½ to 3% annually. The latter testified to the mathematical accuracy of the tables and how the various figures were computed. Appellant's objection to the exhibits is based largely on the ground that the books from which the formulae were obtained were not proved to be works which were accredited and generally recognized as standard and authentic by insurance companies, actuaries

and others whose particular business was computing anuities.

We do not believe it necessary that a witness be an actuary before being qualified to testify to mathematical computations. Neither do we see the necessity for establishing that a book containing multiplication, reduction, discount or interest tables is used by any particular business or profession. The formulae used are standard and can be proved or disproved by any one qualified to deal in mathematics. An accountant testified that one bank in Salt Lake City which he called used the book and it was a standard book used by members of his profession. He had personally checked the formulae used to determine the calculation and had been able to prove its accuracy; that he had spot-checked many of the figures and they were correct and conformed to figures in other standards works; that he or some one in his office had established the accuracy of the computations used and he would do so in court except that it would require an exceedingly long time to compute a given figure through each successive step. The works used were made available to appellant during trial; no suggestion has been advanced that the figures are inaccurate, and, being exact and not opinion evidence, the necessity for showing their common usage is not demanded.

Exhibit H was based upon the United States Life Tables, a publication of the Federal Department of Commerce. While we have been unable to find a reported decision giving judicial sanction to these tables, they were not published until 1944, and it is doubtful that an appellate court has been required to rule on them. Defendant's objection to the admissibility of exhibit H is that plaintiff offered no proof of a general use and acceptance of the United States Life Tables upon which the expectancy factor used in the exhibit is based. The answer to this contention is to

be found, well stated, at page 822 of Volume 20, American Jurisprudence, as follows:

"Generally, a standard mortality table is admissible in evidence where relevant to an issue, without preliminary proof of its authenticity, if the court is satisfied of its authenticity. It is a' generally recognized rule that mortality tables as published in standard encyclopedias, and in standard lawbooks are admissible without further proof of authenticity, although a table printed in a lawbook is not admissible when it is shown not to have been in actual use for the purpose for which such tables are intended, or to have acquired a reputation for accuracy. The court also admits without preliminary proof tables which have been made a part of the statutory law of the state, or which were printed pursuant to legislative authority, *and must in all instances satisfy itself as to the accuracy and authenticity of the tables offered as proof, as well as the media in which they appear.* If the table offered as evidence does not appear to be in actual use for the purpose for which such tables are intended, or to have acquired a reputation for accuracy, *its authenticity must be established by competent evidence.*

"* * * When preliminary proof is required, it should be of such a character that it will satisfy the court of the authenticity of the table, such as testimony of a witness familiar with it and with its use." (Italics added.)

The plaintiff's expert witness testified that the United States Life Tables were published by the United States Department of Commerce, together with the Bureau of the Census, the latter being a permanent office of the Commerce Department; and that the tables were based upon vital statistics compiled by the Department for the years 1939 to 1941 and consisted of separate tables for males and females of white and colored races. Such evidence was proof that the tables were based upon recent information and published by a department of Government charged with the responsibility of preparing and keeping the nation's census. Under these circumstances, there was evidence sufficient to satisfy the trial court as to the accuracy and authenticity of the tables upon which Exhibit H was based and we are not prepared to say that the factor obtained from the tables was not based on accurate information

which would be admissible in evidence to establish plaintiff's expectancy. We conclude the exhibit was properly allowed in evidence.

The most serious question raised by appellant is the one that concerns whether or not the damages awarded are excessive and resulted from passion and prejudice on the part of the jury. Stated in another way and in the form of a question, did the trial judge abuse his discretion in not granting a new trial because the amount awarded by the jury ($70,000.00) appears to have been given under the influence of passion and prejudice?

Appellant has called our attention to a series of events occurring in the trial court which it contends unfairly prejudiced the jury in favor of respondent. Particular complaint is made of such incidents as exhibiting the impaired member, a dramatic demonstration of the difficulty of respondent in obtaining a wallet from his pocket, and the trial court permitting respondent to reopen his case for the purpose of permitting additional evidence on his injuries. These events and incidents in and of themselves are not incompetent or irrelevant and the drama of a trial as it unfolds is largely controlled by the trial court's discretion. Objections made by appellant were considered by the trial judge, and we are not prepared to say that he abused his discretion in the particulars complained of. The trial judge is in a position to determine whether competent evidence is presented in an inflammatory manner, and we must of necessity rely largely on his judgment. The record we have in this case is not sufficient to present the necessity or manner of display. Neither does it disclose a calculated attempt to get before the jury evidence which is incompetent and which should be kept from the jury because it excites in the minds of the jurors pity and commiseration for the condition of respondent. The respondent had lost his right arm and the trial judge concluded he could show to the jury his then present physical

condition and the difficulty he encountered in trying to use his left hand.

The issue on excessive damages must be considered in light of the following evidence: At the time of the accident respondent was 26 years of age and his life expectancy was 38.12 years. Prior to the accident he had enjoyed good health. He first went to work railroading in 1942 and except for approximately three years armed forces duty he continued in that work. He earned around $350.00 per month, but his take home pay for the year 1947 averaged approximately $265.00 per month. He had no specialized training in any other business or profession. Immediately following his injury he was given sedatives, a tourniquet was placed on his upper arm and he was transported to Salida, Colorado, where his arm was amputated just below the shoulder. He remained in the hospital eleven days. About two months later he was taken back to the hospital, given a local anaesthetic and a small piece of bone removed from the end of the stump. He was subjected to the shock, pain and suffering that would accompany such an accident and injury, and, at the time of the trial which was some five months after the accident there was redness of the scar which indicated some irritation. According to his physician respondent was suffering some pain undoubtedly caused by an impingement of the nerve but the doctor would express no opinion as to its permanency. He did express an opinion that after some additional surgery the stump would heal. Respondent was right handed and encountered considerable difficulty in adjusting himsef to the use of his left arm. (From this point on the opinion is not concurred in by a majority of the court and the views expressed are those of the author and the Chief Justice.)

Because of the size of the verdicts being presently rendered this court has been faced on numerous occasions with this same assignment of error. In the recent case of *Pauly*

v. *McCarthy*, 109 Utah 431, 184 P. 2d 123, 126, we stated the rule as follows:

"Where we can say, as a matter of law, that the verdict was so excessive as to appear to have been given under the influence of passion or prejudice, and the trial court abused its discretion or acted arbitrarily or capriciously in denying a motion for new trial, we may order the verdict set aside and a new trial granted. *Jensen* v. *D. & R. G. Ry. Co.*, supra [44 Utah 100, 138 P. 1185, 1192]; and other cases cited above following that decision. But mere excessiveness of a verdict, without more, does not necessarily show that the verdict was arrived at by passion or prejudice. *Stephens Ranch & Livestock Co.* v. *U. P. Ry. Co.*, supra [48 Utah 528, 161 P. 459]. It is true that the verdict might be so grossly excessive and disproportionate to the injury that we could say from that fact alone that as a matter of law the verdict must have been arrived at by passion or prejudice. But the facts must be such that the excess can be determined as a matter of law, or the verdict must be so excessive as to be shocking to one's conscience and to clearly indicate passion, prejudice, or corruption on the part of the jury. *McAfee* v. *Ogden Union Ry. & Depot Co.*, supra [62 Utah 115, 218 P. 98]; *Ward* v. *D. & R. G. W. Ry. Co.*, supra [96 Utah 564, 85 P. 2d 837]. This is not such a case.

"The verdict here was admittedly liberal. But the mere fact that it was more than another jury, or more than this court might have given, or even more than the evidence justified, does not conclusively show that it was the result of passion, prejudice, or corruption on the part of the jury. * * *

"The jury is allowed great latitude in assessing damages for personal injuries. *Miller* v. *So. P. Co.*, 82 Utah 46, 21 P. 2d 865. The present cost of living and the diminished purchasing power of the dollar may be taken into consideration when estimating damages. *Coke* v. *Timby*, 57 Utah 53, 192 P. 624; *McAfee* v. *Ogden Union Ry. & Depot Co.*, supra."

If I follow our previously announced decisions, I must determine whether the verdict is so grossly excessive and disporportionate to the injury that it can be said, from that fact alone, that as a matter of law, the verdict must have been arrived at because of passion and prejudice. If this can be said from the amount of the verdict rendered in this case then the trial judge abused his discretion on his ruling on the motion for a new trial. It is impossible to

arrive at any monetary amount for each of the elements of damage, but it can be determined in a general way the amount the jurors could award without overstepping the bounds of their province. The jury could not reasonably find that respondent's injury would result in total impairment of his earning capacity. There are opportunities for employment of a one-armed person, and while they are limited, they are not non existent. Respondent does not allege or claim doctor or hospital bills, and so no award could be made for these elements. Respondent's specific physical loss consists of the loss of his right arm as he established no other serious and permanent injuries to his body and so the question narrows itself to a determination of what amount is excessive for the loss of a right arm.

When we get in the domain of general damages, reasonable minds differ as to what amount is excessive. However, there must be a limit beyond which a reasonable jury cannot go and the determination must be made on the gross amount of the verdict, not the net amount. If we use the latter we disregard the purposes of the Federal Employers' Liability Act and require the employer to pay for the employee's negligence. Previously decided cases afford some comparison, but differences in economic conditions must be taken into consideration. Juries in different states have different monetary standards and different ideas as to the value of human limbs. There is no regular standard by which to measure general damages yet no amount of logic can demonstrate why one man should obtain $70,000.00 for the loss of an arm while another man obtains $7,000.00. Our present day compensation act is not one which lends itself to a fair comparison, but by reference to it I point out that had respondent been injured in intrastate commerce to the same extent, his recovery for the specific loss would have been approximately $15,000.00. For the same injury an employee subject to the state law recovers about 7 per cent of the verdict here entered. The unfairness existing between the two systems is apparent. Neither

can be used as a standard but somewhere between the two there ought to be a common meeting ground. Admitting that under present day procedure such is not possible, the range of inequity ought not to be as great as is here established.

In dealing with this type of case, I appreciate the difficulties encountered in trying to determine what is an excessive verdict. The court is confronted with similar problems to those presented in determining what might be negligence. The determination of the latter is by methods which are remnants of an archaic system, and, likewise, the determination of the former is by a similar method. Until some definite formulae embodied in a compensation act is prescribed by Congress jurors and courts will be required to deal with unknown elements of inestimable value. Permissible limits are presently far apart and must continue to be wide spread so long as fixing the amount of damages is within the province of a jury. While I concede we can not invade this province to the extent of substituting our judgment for that of the jurors' we are permitted to intervene when all reasonable limits have been exceeded.

Conceding that the elements entering into a judgment for personal injuries are variable, diverse and impossible of exact ascertainment and granting respondent the benefit of what I consider the maximum amount any reasonable jury could award, I am of the opinion that $70,000.00 is excessive for the damages suffered. I, however, would not reverse the judgment as under our previously announced rulings we have the power to order a remission. See *Shepard* v. *Payne*, 60 Utah 140, 206 P. 1098; *Falkenberg* v. *Neff*, 72 Utah 258, 269 P. 1008. I would offer plaintiff an election to either take a reasonable remission or retry the cause.

The judgment is affirmed. Costs to respondent.

PRATT, C. J., and WADE and McDONOUGH, J., concur.

WOLFE, Justice.

I concur with the prevailing opinion in its holding that there was evidence from which the jury could find the respondent negligent. Further that the two tables — Exhibits "G" and "H" — were admissible as guides to inform the jury and to provide it with computations already made to aid with subsidiary facts required to be found by it. I do not think that the verdict is excessive. This man lost his right arm. A second slight operation was necessary after the completion of the amputation. In both operations there was pain and suffering. The first operation was of a pronounced type and attended by considerable shock. Five months after the injury the defendant was suffering from pain due to impingement of the nerve, and no estimate as to its permanency was possible.

This young man has a long way to travel through life with one arm missing if he lives his expected period. He may be able to get work which would pay him something, but during the free periods in the labor market he may not be able to get any work.

The fact that had the plaintiff lost his right arm in an employment where our Workmen's Compensation Law, U. C. A. 1943, 42-1-1 et seq., was applicable, he would get approximately $15,000 is not persuasive that the instant verdict is excessive. In the first place, the award under the compensation is clear. No attorney's fees are generally chargeable to the injured employee. Also, under compensation theory workmen injured without fault, and even by their own fault if the injury was not wilfully inflicted, could obtain compensation for their loss while others who might recover large damages give up the right to recover damages in order that the levelling, averaging and pooling process inherent in the compensation philosophy may be applied. Thirdly, present compensation for the loss of an arm is in view of the present cost of living palpably inadequate.

The verdict in this case was liberal, but not excessive and was not such as to show passion or prejudice in the granting of it.

Also, it is quite possible that the jury may have taken too much from the verdict for the plaintiff's contributory negligence. And from this the plaintiff has no recourse. It is quite likely that the jury looks at these cases realistically by determining what net amount the plaintiff should receive to see him decently through life and then makes the verdict high enough so that its guess as to the amount the plaintiff should be penalized for his contributory negligence when substracted will bring the verdict to the amount they think he should receive. Of course, such mental operations cannot be proved and are not in accord with the purpose of the act, but it is very difficult to prevent a jury from so arriving at a verdict in this fashion. And if so, as before stated, the amount which the jury may subtract for contributory negligence, if it finds there was such, may be excessive but the net verdict may itself be not out of the way.

Present verdicts doubtless seem very high in view of past experience in this state, but it is just as valid a conclusion that injured men may have been awarded too little in the past as it is that they are awarded too much now. Perhaps both are the case. In view of present cost of living and continuing inflation, I cannot say that the verdict is excessive.