MITCHELL v. ARROWHEAD FREIGHT LINES, Limited, et al.

No. 7242.  Decided February 6, 1950.  (214 P. 2d 620.)

Rehearing Denied May 12, 1950.

226

See 23 C. J. S., Damages, sec. 151. Personal injury cases, excessive verdict in, see note, 102 A. L. R. 1125. See, also, 15 Am. Jur. 627.

*Stewart, Cannon & Hanson,* Salt Lake City, *Ernest F. Baldwin, Jr.,* Salt Lake City, for appellants.

*Woodrow D. White,* Salt Lake City, for respondent.

PRATT, Chief Justice.

The plaintiff, J. Harold Mitchell, instituted this action to recover for certain personal injuries sustained by him, and for damages to his property arising out of the collision of his 1946 Chevrolet pick-up truck with a truck and trailer

owned by the Arrowhead Freight Lines, Ltd., and operated by their employee, Marvin C. Van Patten.

The case was tried to a jury, which jury found for the plaintiff and returned a verdict in the sum of $21,594.22. This figure is broken down as follows:

| | |
|---|---:|
| General Damages | $18,691.72 |
| Special Damages | 1,638.50 |
| Second Cause of Action—damage to property | 1,264.00 |
| | $21,594.22 |

The defendants raise three general questions by their assignments of error on this appeal. First, error in the admission into evidence of combined annuity and mortality tables; second, error in the denial of a motion for a new trial; and third, error in the giving of certain instructions and refusal to give others.

The plaintiff was proceeding in a northerly direction in a 1946 pick-up truck, accompanied by three other persons, all of whom were riding in the single seat of the vehicle. Plaintiff was enroute from Arizona where he was at that time employed as superintendent of schools at Safford, Arizona. He had previously made arrangements to terminate this employment at the end of the then current school year, so as to devote more time to his ranch and farm, located near Parowan, Utah. He indicated in his testimony that his intention was to secure teaching employment in the Utah schools near his ranch. He had been engaged in teaching school and in school administrative work for 24 years. He was enroute to deliver the pick-up truck to his ranch when the collision occurred approximately 15 miles south of Beaver, Utah, on U. S. Highway 91. At this point the paved portion of U. S. Highway 91 is 19½ feet wide, and there exists a 4 foot gravel shoulder on either side of the paved portion. This mishap occurred during a severe dust storm which blocked visibility to a considerable extent.

According to plaintiff's version, he was proceeding in a northerly direction at a very slow rate of speed, traveling on the right hand side, or east side of the road. The dust became so intense that he elected to pull off the highway and had in fact cleared the paved portion and had either completely stopped, or else had almost stopped when defendant's truck suddenly loomed out of the dust immediately ahead and crashed into his pick-up truck. The evidence is undisputed that the impact occurred on the east shoulder of the highway, off the paved portion. Just how far east of the paved portion, is in dispute. Plaintiff's daughter and his father who were occupants of the pick-up truck corroborate him at least as to the major details.

The defendants' account of the collision is to the effect that Van Patten, the driver of the Arrowhead truck, which was in fact a large van and trailer, was proceeding in a southerly direction, when he encountered the dust storm. The evidence indicates that he had left Salt Lake City, Utah the previous day, to drive the truck to Cedar City, but had been delayed overnight because of a mechanical breakdown of his truck. According to his testimony, during the dust storm he followed behind a Buick automobile which was pulling a boat on a trailer, and he was traveling at about 15 miles per hour or less during this time. The dust storm was not uniform in intensity, but rather would be very thick and then subside somewhat so that at certain times the visibility while still restricted, was considerably better than at other times. Van Patten, according to his testimony, came to a straight stretch of highway at the same time the storm subsided in intensity somewhat, and he elected to pass the automobile pulling the boat. He testified that at the time he elected to pass, he could see 200 yards ahead and that there were no automobiles on the east side of the highway, which would be the side on which he would pass. Just as he came abreast of the Buick and trailer, according to his testimony, the plaintiff's truck suddenly turned from its own left side, or west side of the highway, and veered

across to the east side of the highway, and that it suddenly created this emergency situation which he, the defendant, Van Patten, tried to avoid by going onto the shoulder on the east side of the road because he hadn't time to get back to his own right hand lane behind the automobile and trailer. He claims that had the plaintiff continued to drive on the east side of the road the collision would have been avoided. This latter is on the theory that he, Van Patten, had the entire truck and trailer off the paved portion of the highway, and onto the shoulder so that the plaintiff's pick-up truck could have passed between the Arrowhead truck and the Buick pulling the boat on a trailer. As to how far away plaintiff's pick-up truck was when Van Patten first saw him, Van Patten variously gives estimates of 100 yards, 100 feet, and 20 to 25 feet. The defendants' theory is that plaintiff was either driving on the west shoulder of the highway and suddenly discovered this fact; or else that he was parked on that side and suddenly crossed to the east side; or else that he was wandering on the paved portion of the highway, and discovered this fact and swerved back onto the east side just at the time Van Patten saw him. Van Patten's testimony is to the effect that when he saw the pick-up truck the first time, it was crossing diagonally across the highway, heading for the east lane.

The point of impact on the Arrowhead truck was about at the right headlight and bumper. The point of impact on the pick-up truck was the left front of the vehicle in front of the driver. The force of the impact apparently turned the pick-up truck half way around so that it faced south, almost parallel to the Arrowhead truck, and facing in the same direction as that truck. The pick-up truck was to the west of the Arrowhead truck and nearer the paved part of the highway when they came to rest.

The Buick pulling the trailer and boat, which was ahead of Van Patten, was driven by a Mr. Pace, who immediately stopped at the scene of the collision. He indicated that

visibility was poor and that the pick-up truck appeared in front of him as though it came out of nowhere; that it was progressing near the center of the highway, or astraddle the yellow line, but that it did not require him to slow down or yield to the right in order to avoid it. While his testimony as to the position of the Mitchell pick-up truck might be construed as possibly corroborating Van Patten's testimony and the theory that plaintiff was driving on the wrong side of the highway, it also directly conflicts with Van Patten's testimony that he had 200 yards visibility, since Pace indicated poor visibility and also that the Mitchell truck appeared suddenly out of nowhere. It appears from Pace's testimony that he at no time was aware of a vehicle following him on the highway until the instant of the crash.

First, we consider the matter of the failure to grant a new trial. The chief basis of the motion for a new trial was that the jury entered a chance verdict. To support the motion affidavits of all but one of the jurors were filed. The substance of these affidavits is that the jurors had agreed in advance to abide by the average of the figures submitted by the jurors on the question of special damages, and that for this reason they awarded the figure which they did for special damages.

Counsel countered with affidavits of each of the jurors who had previously given affidavits. These affidavits were to the effect that they had not understood and carefully considered the language of the previous affidavits, and that the first affidavits were prepared by counsel for defendant and that they had not agreed to be bound by a chance verdict, but rather that they had agreed to each submit a figure which each thought proper for pain and suffering, and to average the figures to see what that figure would be, and that having done so, and agreeing thereafter that the figure thus arrived at was fair, they agreed to accept that figure as their verdict on that point.

The affidavit of the remaining juror who had not previously given an affidavit, was to like effect.

This court has numerous times indicated its displeasure over chance verdicts. See *Midgley* v. *Bergerman,* 30 Utah 17, 83 P. 466; *Archibald* v. *Kolitz,* 26 Utah 226, 72 P. 935; *Lambourne* v. *Halfin,* 23 Utah 489, 65 P. 206; *Wright* v. *Union Pac. Railroad Co.,* 22 Utah 338, 62 P. 317. However, the second or corrective affidavits in this case were in substantially the language of those in the case of *Pence* v. *California Mining Co.,* 27 Utah 378, 75 P. 934, which were held to not indicate a chance verdict. The affidavits recite that there was no agreement in advance to be bound by the figure which would result from averaging the figure submitted by each juror, but rather that afterward they concluded that the figure was fair and so adopted it. *Ehalt* v. *McCarthy,* 104 Utah 110, 138 P. 2d 639. Under the circumstances, we cannot say that there is sufficient evidence of misconduct of the jury in rendering a chance verdict to require us to reverse the ruling of the lower court when it refused a new trial on this ground. See *Archibald* v. *Kolitz,* supra, and *Midgely* v. *Bergerman,* supra. The burden of proving a chance verdict is upon the party contending that a chance verdict has been entered. See cases cited above. The second series of affidavits refute the idea that any juror held himself bound by any agreement in advance to adopt the quotient figure.

It is also contended that the damages were excessive. The appellants in their brief argue certain figures contained in the affidavits as being indicative of an excessive verdict and also on the matter of the use of the combined annuity and mortality tables. The affidavits were submitted by authority of Sec. 104-40-2, subsection (2), U. C. A. 1943, relating to chance verdicts, and they cannot be considered for any other purpose. *Morrison* v. *Perry,* 104 Utah 151, 140 P. 2d 772. This court has heretofore laid down the rule that it is slow to interfere with a

ruling of the lower court granting or refusing a new trial on questions relating to damages.

"Granting or refusing a new trial on these grounds of necessity largely rests within the sound discretion of the trial court." *Hirabelli* v. *Daniels*, 44 Utah 88, 138 P. 1172, 1174.

See also: *Chatelain* v. *Thackeray*, 98 Utah 525, 100 P. 2d 191; *Saltas* v. *Affleck*, 99 Utah 381, 105 P. 2d 176. There is nothing in the case before us to indicate that the trial court abused his discretion in refusing to grant a new trial.

Appellants would also have us determine from certain mathematical computations that the jury followed too closely the mortality and annuity tables and gave a recovery based solely thereon. The case of *Schlatter* v. *McCarthy*, 113 Utah 543 (1948), denial of petition for rehearing, 198 P. 2d 473, provides a sufficient answer to this proposition. In that opinion this precise question was presented and passed upon adversely to this appellant.

Error is alleged to have been committed in the giving of instruction number 6 to the jury. This instruction after explaining the servant relationship between the Arrowhead Freight Lines Ltd. and Van Patten, said:

"You are further instructed that the defendant Arrowhead Freight Lines Ltd., is liable for any negligent acts or omissions, if any, of its servant Marvin C. Van Patten, committed or omitted by him in the course of his employment."

It is contended that this instruction eliminated proximate cause and contributory negligence. Instruction number 3 told the jury that before plaintiff could recover he must prove by a preponderance of the evidence one or more of the acts of negligence alleged in the complaint, and also that such negligence was the proximate cause of the injury or damage. We find no general instruction requiring that each instruction must be considered in the light of the other instructions. The result is that although instruction num-

ber 3 limits liability to actionable negligence as alleged; instruction number 6 appears to make an exception in a servant relationship; where the jury is told that the company is liable for "any" negligence of the servant. Instruction number 9 again emphasizes this relationship with the resulting liability. Is this error overcome by the other instructions? We believe it is for the reason that each time the conduct of the driver is referred to as a possible foundation for liability, the explanation is made in the instructions that his act must be the proximate cause of the injury.

We come now to a consideration of the assignments of error relative to the combined mortality and annuity tables, their admission into evidence, refusal of a motion to strike them, the instructions to the jury on the use thereof, and the refusal to give instructions to the jury withdrawing them from their consideration.

The chart as admitted in evidence was similar to those previously presented before this court, and consisted of a column on the left side thereof of sums of money $1.00, $10.00, $25.00, $50.00, $100.00, $200.00 and $300.00. Across the top of the chart were a series of interest rates, 2½%, 2¾%, 3%, 4%, 5% and 6%. Below each interest figure in each column appears a figure representing the amount of money necessary to be invested at that rate of interest to produce the selected sum of money from the left hand column monthly for the period of time upon which this chart is predicated. The basis of the chart in this case was 242 months, or 20.20 years, which figure was computed from the American Experience and Mortality Tables as the life expectancy of the plaintiff. The chart thus illustrates the present worth in a lump sum of each of the amounts in the left hand column extended over the period of the life expectancy of 20.20 years by showing its discounted worth at the various rates of interest set out on the chart.

The chart was qualified for admission into evidence by an expert accountant who prepared the chart, and testified

as to the foundation of each figure on the chart, how obtained, and how used. He was subjected to a comprehensive cross-examination. The fact that the American Experience and Mortality Tables are based upon averages, only, taken from a survey of deaths within each particular age group, both of persons dying within a few days and those living to old age, was clearly brought out, as was also the possibility of disease or accident shortening the life of any particular person. That the tables do not fix the life expectancy of any particular individual was clearly indicated. A qualified investment authority was present and testified as to interest rates currently available on various types of investments, and he also was thoroughly cross-examined. See *Bennett* v. *Denver & Rio Grande West ern Railroad Co.*, 117 Utah 57, 213 P. 2d 325.

In the case of *Schlatter* v. *McCarthy,* 113 Utah 543, 1948, 196 P. 2d 968, 973, the rule is announced that ■ where there is a permanent injury, and it

"is of such nature as to indicate a permanent material impairment of a substantial nature in the earning capacity of the plaintiff, the mortality and annuity tables are admissible."

The plaintiff in the present case introduced expert and lay evidence indicating that certain of his injuries were permanent in character, and testimony that they would result in a permanent material impairment of a sub stantial nature to his earning capacity. The per- ■ manent injuries as testified to consisted of injury to plaintiff's neck, with permanent limitation in the motion thereof coming from a fracture of the first cervical vertebrae, and with constant pain at the base of his head; permanent limitation of the jaw, resulting from three fractures of the jaw, one of which was described as compound comminuted, a second as compound, and the third as a simple fracture, restricting his ability to open his mouth to about ¾ inch; loss of all upper teeth, and some lower teeth, either as a direct result of them having been knocked

out in the collision, or else made necessary in repairing the damage done by the collision; an area of anesthesia about the left ear and side of chin, resulting from an almost complete severance of that ear, and a consequent severance of the nerves; an area of anesthesia about the lower left rib resulting from fracture; limitation of motion of the left thumb; an encroachment in the nasal passage due to fracture of the nose and deviation of the septum resulting in obstruction to breathing; and permanent impairment of bodily function arising from his injuries, as early fatigue, tendency toward traumatic neurosis, and a phlegmatic attitude toward attacking problems of any magnitude. The evidence as to permanency and impairment of earning capacity was controverted. This however merely created a jury question, since there was ample evidence from which the jury could find permanent injury which would result in a permanent material impairment of a substantial nature to his earning capacity.

As a foundation for the use of the tables by the jury, evidence was introduced as to plaintiff's past earnings, his age, life expectancy, prior good health and physical condition, and the various activities engaged in by him prior to the injury as bearing upon his capabilities. No evidence was introduced as to the exact percentage of permanent disability and impairment of earning capacity. The range on the exhibit however, was from $1.00 to $300.00 and the amount of impairment would come within the range of this exhibit. The exhibit does not cover comprehensively each possible amount within that range, but is sufficiently illustrative that simple arithmetic would provide a reasonable accurate guide, and of course, absolute accuracy is not required. There is nothing about the combined table which is suggestive of any excessive amount of recovery for impairment of earning capacity, and in fact, the cautionary instruction given concerning its use specifically informed the jury that the entry of the exhibit into evidence was no indication that plaintiff had sustained

any permanent loss of earning capacity, nor an indication that he suffered any particular amount of loss of earning capacity. The jury was instructed that unless it first found from a preponderance of the evidence that plaintiff sustained a permanent injury resulting in a permanent material impairment of a substantial nature to his earning capacity, the tables were to be disregarded. The trial court thus instructed the jury in light of the *Schlatter* v. *McCarthy* case.

The fact that the tables are not comprehensive as to cover every conceivable possibility, and that they may be subject to some occasional misuse is not a reason for excluding from the jury the best available information upon which to found its deliberations. See *Bennett* v. *Denver and Rio Grande Western Railroad Company,* supra. It may be that in a given case further cautionary or limiting instructions would be appropriate based upon evidence indicating that averages are not appropriate or applicable to the particular person for whom the tables are introduced. No such instructions based upon such evidence were requested in this case. We conclude that there was no error in the introduction and use of the combined mortality tables and annuity tables, nor in the instructions given on the use thereof.

Other alleged errors have been assigned attacking the merit of the instructions given or the failure to give those instructions requested upon the elements of actionable negligence and the defense of contributory negligence. We have examined them and find no prejudicial error therein.

Judgment for the plaintiff is affirmed. Costs to the respondent.

WADE, WOLFE, LATIMER and McDONOUGH, JJ., concur.